**UNITED STATES of America,**
**Plaintiff,**

v.

**W.R. GRACE, Alan R. Stringer, Henry A. Eschenbach, Jack W. Wolter, William J. McCaig, Robert J. Bettacchi, O. Mario Favorito, Robert C. Walsh, Defendants.**

**No. CR 05–07 M SWM.**

United States District Court,
D. Montana,
Missoula Division.

July 14, 2006.

Angelo J. Calfo, Harold Malkin, Michelle K. Peterson, Yarmuth Wilsdon Calfo, Seattle, WA, Michael F. Bailey, Bailey & Antenor, Missoula, MT, David S. Krakoff, Gary A. Winters, Mark Holscher, Mayer Brown Rowe Maw LLP, Washington, DC, Ronald F. Waterman, Gough Shanahan Johnson & Waterman, Helena, MT, Jeremy Maltby, O'Melveny & Myers, Los Angeles, CA, William Adam Duerk, Michael J. Milodragovich, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, Elizabeth Van Doren Gray, Sowell Gray Stepp & Lafitte, Columbia, SC, Palmer A. Hoovestal, Hoovestal Law Firm, Helena, MT, William A. Coates, Roe Cassidy Coates & Price, Greenville, SC, for Defendants.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction[1]

The seven individual Defendants have filed motions to sever their trials from Defendant Grace and, in certain instances, all other co-defendants as well. The motions are based on varying grounds. The multifaceted motions include assertions about the prejudicial effect of trying some defendants together, the length of the trial, and the individual Defendants' intent to rely on an advice of counsel defense which must be established through the presentation of some documents in which Defendant Grace claims an attorney-client privilege. Individually the Defendants argue that Grace's attorney-client privilege claim compels separate trials, although they do not explain why Grace's privilege claim would be of any less validity at a severed trial.

The United States opposes the motions to sever. For the reasons that follow, the trial of Defendants Favorito and Stringer will be severed. Examination of documents produced under seal convinces me that if severance is denied Fifth and Sixth Amendment issues would inevitably give rise to a serious question of fairness at a joint trial. Defendants Favorito and Stringer will be tried together at a date to be set. The remaining Defendants will be tried jointly as scheduled on September 11, 2006.

### II. Analysis

#### A. Legal Standard

█ The public has a substantial interest in the joint trial of defendants jointly charged under Federal Rule of Criminal

1. The facts of this case are well known to the Court and the parties and will not be recited here except where necessary.

Procedure 8(b). *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir.1976). The public interest favors joint trials because such trials " 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.' " *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (quoting *Bruton v. United States*, 391 U.S. 123, 134, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). A joint trial also helps to avoid "the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). The Ninth Circuit has found joint trial to be "particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the evidence would be admissible against each of them in separate trials." *United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir.2004).

 Federal Rule of Criminal Procedure 14(a) states: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants's trials, or provide any other relief that justice requires." A trial judge has wide discretion in deciding a motion to sever, and such decisions will seldom be disturbed on appeal. *United States v. Ponce*, 51 F.3d 820, 831 (9th Cir.1995). The Ninth Circuit has characterized the scope of review as "extremely narrow," *see United States v. Mariscal*, 939 F.2d 884, 886 (9th Cir.1991), and quoted with approval a Second Circuit decision calling a district court's severance ruling "virtually unreviewable," in *United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir.1993) (quoting *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir.1978)). It is not enough for a defendant to show that he would stand a better chance of acquittal in a separate trial. *Zafiro*, 506 U.S. at 540, 113 S.Ct. 933. Severance should be granted only where joinder is " 'so manifestly prejudicial that it outweighs the dominant concern with judicial economy.' " *United States v. Doe*, 655 F.2d 920, 926 (9th Cir.1980) (quoting *United States v. Brashier*, 548 F.2d 1315, 1323 (9th Cir. 1976)). The Supreme Court has alternatively cast the standard as one under which severance should not be granted unless "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933.

 The following factors are among those to be considered in evaluating the prejudicial effect of joinder:

(1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant;

(2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used;

(3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and

(4) whether [the defendant can] show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Fernandez*, 388 F.3d at 1241 (9th Cir. 2004). The first two factors bear particular emphasis in the severance inquiry. *Id.* "The judge's diligence in instructing the

limited purposes for which various evidence may be used is a 'critical factor' in assessing the jury's ability to compartmentalize the evidence against each defendant." *Baker*, 10 F.3d at 1387 (quoting *United States v. Cuozzo*, 962 F.2d 945, 949 (9th Cir.1992)). Careful and frequent cautionary instructions can reduce or eliminate any prejudice which might otherwise result from a joint trial. *See United States v. Castro*, 887 F.2d 988, 998 (9th Cir.1989); *Fernandez*, 388 F.3d at 1243. Even so, there are some situations that make frequent cautionary instructions a mere formality or a procedural nicety that substitutes a form of fairness for the substance of fairness.

■■■ Severance is sometimes available when two or more co-defendants intend to present antagonistic defenses. *United States v. Angwin*, 271 F.3d 786, 795 (9th Cir.2001). "To warrant severance on the basis of antagonistic defenses, co-defendants must show that their defenses are irreconcilable and mutually exclusive." *Id.* Defenses are not mutually exclusive unless " 'acquittal of one codefendant would necessarily call for the conviction of the other.' " *Id.* (quoting *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir.1991)); *see also United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir.1996) (severance requires a defendant to show that "the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant"). Defenses which are not mutually exclusive but are merely mutually antagonistic do not require severance. *Zafiro*, 506 U.S. at 538, 113 S.Ct. 933 (severance based on mutually antagonistic defenses not required where two

defendants claimed ignorance of the presence of drugs in apartment).

## 2. Mega-trial

■■■ Some of the individual Defendants argue that the Court should apply a different severance analysis in this case because the case will be a "mega-trial." In *Baker*, the Ninth Circuit suggested that district courts be especially mindful of the potential need for severance in "mega-trials." 10 F.3d at 1390–1393. Where it appears from the number of defendants and the number of charges that a trial will be of abnormal duration, the circuit recommends that a district court "elicit the prosecution's good-faith estimate of the time needed to present its case." *Id.* at 1392. "When the estimate exceeds four months, the judge should require the prosecution to justify its conclusion that a joint trial serves the ends of justice. When more than ten defendants are involved, this justification should be especially compelling." *Id.* The Defendants contend that this case will require a mega-trial under *Baker* and ask that the burden be shifted to the government to explain why the ends of justice are best served by a joint trial.

In this argument the Defendants are wrong, because the trial in this case will not be as long nor as cumbersome as the trial in *Baker*. The trial in *Baker* lasted 16 months and featured 15 defendants charged in 44 counts, including two conspiracy counts and one count of continuing criminal enterprise. *Id.* at 1386. The court of appeals stated its belief that the entire case would have required less than 16 months of courtroom time if the same defendants had been tried in "manageable groups of three or four." *Id.* at 1390.[2] Here the government has estimated that it

**2.** Nonetheless, the court affirmed the district court's ruling denying the defendants' mo- tions for severance. *Id.* at 1389.

will take less than three months to present its case-in-chief.[3] The Defendants' repeated predictions of a trial lasting longer than six months are inaccurate. There are only eight defendants, and they have worked in concert throughout this proceeding. Every defendant is named in the conspiracy count that lies at the heart of this prosecution, meaning separate trials would multiply, rather than reduce, the courtroom time needed to try this case.

This case does not present the problems accompanying mega-trials about which the Ninth Circuit warns in *Baker*. The *Baker* court noted the risk that a trial my be lengthened due to scheduling conflicts in a case involving dozens of jurors, defendants, and attorneys, and that the result is that defendants may have to spend months or even years incarcerated while they are presumed innocent. *Id.* at 1390. Scheduling conflicts will not lengthen the trial of this case. The parties are aware of the Court's expectations regarding attendance, and the trial will not be delayed for any party's convenience. Moreover, the Defendants in this case are released pending trial and will endure no loss of liberty due to the length of the trial. The *Baker* court also expressed concerns that Defendants facing a lengthy trial would have difficulty obtaining counsel of their choice, either because the defendants could not afford the fees or because attorneys would be unwilling to suspend their practice to participate in the trial. *Id.* Neither of those problems is present in this case. Indeed, the number of lawyers involved indicates cost of defense is not an issue in the case.

The *Baker* court noted that a long trial can result in neglect of the trial court's regular docket, *id.* at 1391, but the strain on the docket will be minimal in this case because the Court has arranged for visiting district judges to handle the regular caseload on a regular and rotating basis throughout the trial. For these and other reasons, this case will not be a mega-trial as described by the Ninth Circuit in *Baker*.

**B. Individual Defendants' motions to sever**

**1. Motions based on prejudicial joinder**

■ Defendants McCaig, Walsh, Bettacchi, Wolter and Eschenbach have moved for severance based on the risk of prejudice and guilt by association arising from a trial in which many of the charges do not pertain to them and some of the evidence would be inadmissible were they tried alone. Of particular concern to these Defendants is the risk of prejudice from the admission of evidence the government intends to offer under Federal Rule of Evidence 404(b). The individual Defendants argue that they will be unfairly prejudiced by the potential Rule 404(b) evidence,

---

**3.** The following exchange took place at the December 2, 2005 status conference:

The Court: Well, if you thought you could prove your case with 80 witnesses, why do you need 233?

Mr. McLean: I've learned more since I told you that, Your Honor.

The Court: Well, what does that do to your estimate in terms of the amount of trial time?

Mr. McLean: I don't think it affects it a whole lot. As Mark Holscher and I have corresponded, he has estimated that if we did five witnesses a day, that would be about nine weeks of trial. For the government's case. And I responded that, really, five witnesses a day is a pretty conservative estimate. Some days we'll do two and some days we'll do 12. But even Mr. Holscher's math results in the government's case taking nine weeks.

Transcript of December 2, 2005 status conference at p. 7. I am likely to impose a time limit of six weeks for the prosecution, and six weeks for the defense of this case.

which is admissible, if at all, only against Defendant Grace.

Defendant McCaig[4] argues that he is charged in only one count (the Count I conspiracy) and he is mentioned in only a handful of paragraphs in the Indictment as doing acts consisting primarily of receiving and reviewing documents. The Indictment alleges certain less passive acts by McCaig, such as authoring a memo counseling against adopting a uniform shower policy for Grace employees (¶ 138); providing mill tailings to a Libby elementary school for use in a skating rink (¶ 141); and leasing a contaminated property without disclosing the health hazard (¶ 159).

Defendant Walsh[5] is also charged only in the Count I conspiracy. He argues that he will be prejudiced because the trial "will stretch over many months, and will involve hundreds of witnesses, more than a dozen experts, and close to 800 exhibits before the Defendant will have an opportunity to call his first witness." Def. Walsh's Br. at 2. Walsh emphasizes that he is named in just four overt acts covering six months during the entire 26–year conspiracy alleged in Count I. The acts consist primarily of arranging the McGill mortality and morbidity study and discussion of the study's findings (Indictment ¶¶ 111, 112 and 114). He argues that he will suffer prejudice because the jury will be unable to dissociate him from evidence admitted against his co-defendants.

Walsh and Defendant Eschenbach,[6] who likewise is named only in the Count I conspiracy, argue that evidence relating to the substantive Clean Air Act counts (Counts II–IV) will be unfairly prejudicial to them if the Court rules in the Defendants' favor on their motion to dismiss the Clean Air Act knowing endangerment object of the Count I conspiracy as time-barred. Without a Clean Air Act allegation in the Count I conspiracy, evidence of Clean Air Act violations relates only to the substantive counts and would be inadmissible against Defendants Walsh and Eschenbach were they tried alone. The Court has since granted the Defendants' motion to dismiss Count I's knowing endangerment object, *United States v. W.R. Grace*, 434 F.Supp.2d 879 (D.Mont.2006), but the United States has attempted to cure the statute of limitations problem by filing a Superseding Indictment re-alleging the knowing endangerment object of the

4. Paragraph 42 of the Indictment alleges that Defendant McCaig

 held different positions with defendant W.R. GRACE, including: from on or about January, 1971, he was a Maintenance Engineer at the Libby Mine; from on or about 1976 to on or about 1979, he was Maintenance Superintendent at the Libby Mine; from on or about 1979 to on or about 1988, he was General Manager of Operations at the Libby Mine; and from on or about 1988 to on or about August 31, 1995, he was Manufacturing Manager of Specialty Vermiculite of CPD Business Unit in Enoree, South Carolina.

5. Paragraph 45 of the Indictment alleges that Defendant Walsh

 held different positions with defendant W.R. GRACE, including: from on or about 1982 to on or about 1989, he was President of [the Construction Products Division]; from on or about 1989 to an unknown time he was Executive Vice President of Grace Specialty Chemicals Co.; and from an unknown time to on or about 1994, he was Senior Vice–President of defendant W.R. GRACE.

6. Paragraph 40 of the Indictment alleges that Defendant Eschenbach

 held different positions with defendant W.R. GRACE, including: from on or about 1971 to on or about 1977, he was an Industrial Hygienist in the Industrial Chemicals Group ("ICG"); and from on or about 1977 to on or about December 31, 1996, he was the Director of Health, Safety, and Toxicology for ICG.

Count I conspiracy.[7] For the reasons set forth below, my decision not to grant severance based on prejudicial joinder is the same regardless of whether the knowing endangerment object of the Count I conspiracy stands.

Defendants Wolter[8] and Bettacchi[9] join Defendants Walsh, Eschenbach and McCaig in seeking severance based on the risk of "spillover" prejudice from the government's proposed Rule 404(b) evidence. The government has signaled that it may attempt to introduce the following evidence under Rule 404(b):[10]

(1) Defendant Grace's *Alford* guilty plea to making a false statement to the EPA in violation of 18 U.S.C. § 1001. The charge was based on Grace's response to an EPA request for information relating to the agency's investigation into contamination of drinking water wells in Woburn, Massachusetts. The government intends to introduce the *Alford* plea as evidence that Grace and Defendant Favorito were aware that EPA requests for information must be answered accurately and completely.

(2) Defendant Grace's liability for the environmental clean-up in and around Libby, including evidence that Grace was ordered to pay the EPA over $54 million in reimbursement costs. The government intends to introduce the financial penalties as evidence of Grace's motive to conceal the extent of the contamination in Libby.

(3) Evidence that Defendant Grace obtained knowledge of the dangerousness of tremolite before the start of the charged conspiracy, as reflected in the government's trial exhibits 1 through 16.

(4) Defendant Grace's decision to file for bankruptcy and subsequent reorganization, including Grace's estimates of its asbestos liability and a settlement agreement resulting in $1.2 billion being returned to the bankruptcy estate. The government intends to introduce evidence of Grace's asbestos-related liability as evidence of Grace's financial motive to conceal the extent of the contamination in Libby.

Without ruling on the merits of pending evidentiary questions, my initial impression is that much of the government's proposed evidence does not meet the re-

---

**7.** The Defendants have filed a motion to dismiss the knowing endangerment object of Count I of the Superseding Indictment (Doc. No. 596).

**8.** Paragraph 41 of the Indictment alleges that Defendant Wolter

held different positions with defendant W.R. GRACE, including: from on or about September 15, 1975 to on or about 1988, he was Vice–President of Mining and Engineering for the Construction Products Division ("CPD"); and from on or about 1988 to on or about 1994, he was Vice–President and General Manager of CPD.

**9.** Paragraph 43 of the Indictment alleges that Defendant Bettacchi

held different positions with defendant W.R. GRACE, including: from on or about 1979 to on or about 1986, he was General

Manager of CPD; from on or about 1986 to on or about 1989, he was Vice–President of CPD; and from on or about 1989 to the present, he was President of CPD and Senior Vice–President of defendant W.R. GRACE.

**10.** Federal Rule of Evidence 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.…

quirements of Rule 404(b) and will be inadmissible in the government's case-in-chief.[11] Two other problems exist with the Defendants' arguments relating to the 404(b) evidence. First, the Defendants overstate the breadth and impact of the potential 404(b) evidence. In the Rule 404(b) context, the government's evidence is limited to that which is necessary to establish, or to make more likely, the fact for which it is admitted, for example knowledge, motive, etc. Prejudicial evidence that is related but unnecessary to establish the fact sought to be proved must be measured against the yardstick of relevance and is generally inadmissible. Federal Rules of Evidence 402 and 403. For example, the Defendants assume that evidence of Grace's *Alford* plea in 1982 will be accompanied by a detailed summary of the alleged drinking water contamination in Woburn. Such evidence, the Defendants say, will be "highly inflammatory," Wolter's Br. at 12, "incendiary," Wolter's Br. at 14, and "enormously prejudicial," Eschenbach's Br. at 14. These fears are misplaced. Evidence of Grace's *Alford* plea is of dubious relevance. But if the plea is admitted, the fact of the plea to a charge of false statement is all that is necessary for the government to prove in its effort to establish knowledge, intent, motive, plan, or absence of mistake. Details regarding the alleged contamination in Woburn are irrelevant to the permissible purposes listed under Rule 404(b) and, due to their prejudicial nature, are not admissible in the government's case-in-chief. *See* Fed. R.Evid. 403.

■ The more fundamental problem with the Defendants' 404(b) position, and their argument based on prejudicial joinder generally, is that it reflects a skepti-cism about the ability of the Court to craft limiting instructions regarding specific evidence and the ability or inclination of the jury to follow them. "A defendant seeking severance based on the 'spillover' effect of evidence admitted against a co-defendant must also demonstrate the insufficiency of limiting instructions given by the judge." *United States v. Joetzki,* 952 F.2d 1090, 1094 (9th Cir.1991). The Defendants insist that the jury in this case, weary from months of trial and baffled by complex proof, will conflate defendants and charges as they muddle through to an unreliable verdict. This lack of faith in the jury's capacity to follow instructions is contrary to my experience and contrary to "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (citing *Francis v. Franklin,* 471 U.S. 307, 325 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).

Jurors are called upon to serve in accordance with the law and to decide what facts have been proved and whether they have been proved beyond a reasonable doubt. Citizens do not assume this mantle lightly. Doubts and skepticism may be warranted in measuring the way other parts of government work, but they are unwarranted with Montana juries. I do not believe that the alleged wrongdoing in this case and any defenses to the alleged wrongdoing are beyond the comprehension of the typical juror. The jury in this case will approach their service with great care and attention and will strive to treat each defendant fairly and individually. They will be given detailed guidance and limiting instructions from the Court. At the appropriate time counsel for each defendant will contribute by carefully framing

---

11. The Defendants' motions in limine regarding the government's proposed Rule 404(b) evidence (Doc. Nos. 454, 472, 476 and 480) will be resolved by separate order.

for the jury the charges and evidence against their particular client.[12] The combined efforts of the jury, the Court and the attorneys will enable the jury to collate and appraise the evidence against each individual defendant and to reach a reliable judgment about guilt or innocence. The Defendants' motions for severance based on prejudicial joinder are denied.

### 2. Motions based on Grace's attorney-client privilege

 Defendants Stringer,[13] Favorito,[14] Eschenbach, Wolter and Bettacchi intend to rely upon an advice of counsel defense that they say can only be established through the presentation of documents and testimony over which Defendant Grace claims an attorney-client privilege. The individual Defendants argue that severance is required to allow them to present the privileged evidence. Defendant Grace takes the position that it will not waive its attorney-client privilege in this proceeding and that it intends to assert the privilege at any severed proceeding as well. The individual

Defendants do not explain why Grace's privilege would not apply at a severed trial. The United States has staked out the middle ground, arguing that the individual Defendants are entitled to present exculpatory evidence over which Grace holds a privilege but that severance is not necessary.

 The differing positions taken by Grace, the individual Defendants and government require the Court to resolve a series of questions concerning this issue. The first question is whether and under what circumstances the attorney-client privilege must give way to a criminal defendant's Sixth Amendment right to present a defense where the privilege, if recognized, would exclude exculpatory evidence. If that question is answered in the affirmative, the Court must then assess *in camera* the documents submitted by the individual Defendants to determine whether they would be of such exculpatory value that their exclusion amounts to a denial of the individual Defendants' right to present a defense. If the documents are of sufficient probative value as to implicate the individ-

---

**12.** Defendant Walsh frets that

> "[a] jury, forced to listen to [evidence against Defendant Grace] for months on end before Mr. Walsh, or any Defendant, has a chance to call his own witnesses, will inevitably come to view the Defendants as a unitary entity. The logistics of the trial itself, which will likely involve primary cross-examination of each Government witness by a single designated lawyer from the defense team (with other counsel asking primarily client-specific questions) will only further this impression."

Walsh's Br. at pp. 18–19. Contrary to Defendant Walsh's argument, I believe client-specific questioning will have the effect of continuously emphasizing the severality of the individual Defendants, rather than conditioning the jury to view them collectively. Walsh and his counsel should get it out of their collective heads that the evidence is going to go on for "months on end."

**13.** Paragraph 39 of the Indictment alleges that Defendant Stringer

> held different positions with defendant W.R. GRACE, including: from on or about September 8, 1981 to on or about 1988, he was the Libby Mine Supervisor; from on or about 1988 to on or about 1994, he was the General Manager of Operations at the Libby Mine; and from on or about 1999 to the present, he served as defendant W.R. GRACE's representative relating to EPA's Superfund Cleanup.

**14.** Paragraph 44 of the Indictment alleges that Defendant Favorito

> held different positions with defendant W.R. GRACE, including: from on or about 1970 to on or about 1993, he was corporate legal counsel for ICG; and from an unknown time but no earlier than on or about 1993 to the present, he was Assistant Secretary of defendant W.R. GRACE and Chief Group Counsel.

ual Defendants' Sixth Amendment rights and therefore must be admitted at trial over Grace's privilege claim, then it is necessary to decide whether the prejudice to Grace is so great that severed trials are necessary under Rule 14(a). The resolution of the problem on reaching this point depends on whether the admission of the privileged evidence is prejudicial to Defendant Grace's trial rights, or if it is merely prejudicial to Grace's interest in the confidentiality of its attorney-client communications. If the latter is true, the Defendants can be tried jointly. If the former is true, and Grace would be prejudiced at a joint trial, severance is necessary to avoid the prejudice. Each of these questions is considered in turn below.

### a. Sixth Amendment vs. attorney-client privilege

█ Federal Rule of Evidence 501 states in relevant part:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the Courts of the United States in the light of reason and experience.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081,

141 L.Ed.2d 379 (1998) (citing *Upjohn*, 449 U.S. at 389, 101 S.Ct. 677). The attorney-client privilege may be asserted by an individual or any entity, including a corporation. *Upjohn*, 449 U.S. at 395, 101 S.Ct. 677.

The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

█ Though not expressly stated in the text of the Sixth Amendment, a defendant's right to present evidence in his defense is protected by the federal Constitution. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations, internal quotations omitted); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) ("Our cases establish, at a minimum, that criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt."); *Taylor v. Illinois*, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (holding that the Sixth Amendment protects "the right to present the defendant's

version of the facts as well as the prosecution's").

This case presents a conflict between the policy favoring confidentiality of attorney-client communications and the right of a criminal defendant to present evidence, including exculpatory evidence, in his defense. Because no Ninth Circuit or Supreme Court case directly addresses whether and under what circumstances the right to present a defense can trump the attorney-client privilege, it is necessary to look to other cases arising in the Sixth Amendment context for analogous principles, including cases involving conflicts between evidentiary rules and the Confrontation Clause.

In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court considered a constitutional challenge to a Texas statute prohibiting criminal defendants charged as co-participants from testifying for one another at trial. The statute was rooted in the common-law practice of excluding interested parties from testifying. The specific concern in the case of co-defendants was that each co-defendant would attempt to exculpate the other. *Id.* at 20–21, 87 S.Ct. 1920. Reasoning that the Sixth Amendment was "designed in part to make the testimony of a defendant's witnesses admissible on his behalf in court," the Court held unconstitutional the rule preventing an alleged accomplice from testifying for the defendant. *Id.* at 22–23, 87 S.Ct. 1920. The Court cautioned that its ruling should not be construed "as disapproving testimonial privileges, such as the privilege against self-incrimination or the lawyer-client or husband-wife privileges, which are based on entirely different considerations from those underlying the common-law disqualifications for interest." *Id.* at 23 n. 21, 87 S.Ct. 1920.

In *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Court found a violation of a criminal defendant's constitutional right to confront and cross-examine witnesses where the State's common-law "voucher rule" prevented the accused from cross-examining a witness who previously confessed to the crime and the hearsay rule kept out the testimony of others to whom the witness had confessed. The Court saw that the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process," 410 U.S. at 294, 93 S.Ct. 1038, and concluded that the evidentiary rules as applied deprived the defendant of due process of law. The Court expressly limited its holding to the facts of the case and was careful to leave undisturbed the right of states to establish and implement rules and procedures in criminal trials. *Id.* at 302–303, 93 S.Ct. 1038.

In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Court was again presented with a conflict between the Sixth Amendment and an evidentiary rule. The defendant in *Davis* was convicted of burglary after he was kept from inquiring about the juvenile burglary convictions of a critical prosecution witness pursuant to a state evidentiary rule rendering juvenile convictions inadmissible. *Id.* at 311 nn. 1–2, 94 S.Ct. 1105. The Supreme Court reversed, holding that the defendant's Sixth Amendment right to cross-examination must prevail over the state's legitimate policy interest in keeping juvenile adjudications confidential. *Id.* at 319, 94 S.Ct. 1105. In explaining its reasoning, the Court used a balancing test for determining whether the state's evidentiary rule must give way to the constitutional rights of the accused. That test hinges on the likely impact of the excluded testimony:

Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

*Id.*

In *Rock,* a defendant charged with manslaughter sought to introduce her hypnosis-induced recollection of the events in question and the trial court refused to allow her testimony. 483 U.S. at 48, 107 S.Ct. 2704. The Supreme Court of Arkansas affirmed, adopting a rule excluding *per se* hypnosis-induced testimony due to the inherent unreliability of such testimony. *Id.* at 48–49, 107 S.Ct. 2704. The United States Supreme Court reversed, holding the unilateral exclusion of hypnosis-induced testimony is contrary to the "accused's right to call witnesses whose testimony is 'material and favorable to his defense.'" *Id.* at 52, 107 S.Ct. 2704 (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). As in *Davis,* the Court implied the existence of a balancing test to determine whether an evidentiary rule places an unconstitutional limitation on a defendant's Sixth Amendment rights:

> Of course, the right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. But restrictions of a defendant's right to testify may not be arbitrary or disproportionate

to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify.

*Id.* at 55–56, 107 S.Ct. 2704 (citation, internal quotation omitted).

The Court in *Taylor* considered whether a trial court's refusal to allow an undisclosed defense witness to testify may violate the defendant's Sixth Amendment right to call witnesses on his own behalf. In upholding the exclusion of the undisclosed witness the Court stuck to the principle of balancing the competing interests to determine whether application of an evidentiary rule violates the Sixth Amendment:

> In order to reject petitioner's argument that preclusion is *never* a permissible sanction for a discovery violation it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

484 U.S. at 414–415, 108 S.Ct. 646 (emphasis in original).

■ These cases provide a useful framework for analyzing the issue before the Court. The cases use the mechanism

of a balancing test in which the evidence or testimony sought to be introduced by the defendant is weighed against the policy behind the rule requiring that the evidence be excluded. The Supreme Court has stated in summary fashion that the principle requires the evidentiary rules to yield to Sixth Amendment rights where application of the rules of evidence would "significantly undermine[ ] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (synthesizing the holdings of *Rock, Washington* and *Chambers* ). It follows hand in glove that in weighing the competing interests it is the exculpatory value of the lost evidence to the accused that weighs most heavily on the scale of fair trial. *Id.* at 316–317, 118 S.Ct. 1261; *Davis,* 415 U.S. at 319, 94 S.Ct. 1105; *Rock,* 483 U.S. at 57, 107 S.Ct. 2704.

The question here is whether this balance can tip the scale in its application, where the evidentiary rule at issue is the ban against divulging attorney-client communications. The Supreme Court has not applied its Sixth Amendment jurisprudence in a case where the attorney-client privilege served as the basis for excluding evidence sought to be introduced by the defendant. Indeed, the Court twice endeavored to make clear that particular holdings requiring that evidentiary rules yield to the constitutional rights of the accused did not extend to evidentiary rules implementing privileges. *See Washington,* 388 U.S. at 23 n. 21, 87 S.Ct. 1920; *Taylor,* 484 U.S. at 410, 108 S.Ct. 646. But the Court has never categorically stated that privilege claims will always win out over the right of the defendant to present a defense. This proposition is not surprising because the resolution of each case has hinged on a fact-specific balance of the evidence offered by the defense versus the rule requiring its exclusion.

Ninth Circuit case law provides guidance. In *Murdoch v. Castro,* 365 F.3d 699 (9th Cir.2004), the Circuit considered a habeas petition presenting a conflict between the attorney-client privilege and a criminal defendant's Sixth Amendment rights in the Confrontation Clause context. The petitioner in *Murdoch* was accused of committing a murder during the robbery of a bar. *Id.* at 701. Several people were involved in the crime, one of whom had already been convicted for his role in the murder and agreed to testify against the petitioner in hopes of receiving a lighter sentence. *Id.* Without the testimony of the petitioner's alleged accomplice, the government's case against him was weak. *Id.* The petitioner therefore sought to impeach the testimony of his alleged accomplice by introducing a letter, written by the accomplice to his attorney, in which the accomplice exonerated the petitioner. *Id.* at 701–702. The trial court refused to admit the letter into evidence or to permit the petitioner to cross-examine the accomplice as to its contents. *Id.* at 702.

On appeal, the Ninth Circuit noted that the Supreme Court has not yet addressed a conflict between the Confrontation Clause and the attorney-client privilege, but stated that the Supreme Court's precedents "clearly provide that evidentiary privileges or other state laws must yield if necessary to ensure the level of cross-examination demanded by the Sixth Amendment." *Id.* The *Murdoch* court also noted the Seventh's Circuit's statement in *United States v. Rainone,* 32 F.3d 1203, 1206 (7th Cir.1994), that " 'Even the attorney-client privilege ... hallowed as it is, yet not found in the Constitution, might have to yield in a particular case if the right of confrontation ... would be violated by enforcing the privilege.' " 365 F.3d at 703. Based on the authority cited by the court in *Murdoch* it is likely that our

Circuit would resolve the conflict using a balancing test similar to that outlined by Supreme Court cases. *Id.* (citing *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 501 (7th Cir.1982)), in which the Seventh Circuit stated, "The court must ultimately decide whether the probative value of the [excluded] alleged privileged communication was such that the defendant's right to effective cross examination was substantially diminished.".

Recognizing the proposition that the attorney-client privilege could in certain instances yield to a defendant's Sixth Amendment rights, the *Murdoch* court vacated the district court's denial of the habeas petition and remanded the case to allow the district court to consider the contents of the privileged letter, which was not part of the record on appeal. 365 F.3d at 706. In remanding the case, the court implied a balancing test for resolving such conflicts:

> [W]ithout the letter, we are unable to determine in the first instance whether, in this case, the attorney-client privilege must fall before the right of the petitioner to seek out the truth in the process of defending himself. We will not require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness, where neither the state nor federal courts actually reviewed the privileged material on habeas and made a decision as to its relevant probative value.

*Id.* (citation, internal quotation omitted).

 The *Murdoch* case implements the balancing test analogized from Supreme Court case law and confirms that the test applies when there are conflicts between evidentiary rules and the Sixth Amendment, even in cases where the evidentiary rule at issue is the attorney-client privilege. Grace argues that *Murdoch* is nonetheless inapposite because the constitutional right at issue in *Murdoch* was the right to confrontation, not the right of the defendant to present evidence that is at issue here. Grace attempts to distinguish the right to confrontation as "a *categorical* right to cross-examine those presenting evidence against [a defendant]." Grace's Br. at 3 (emphasis in original). By contrast, Grace argues, the right to present evidence, while also protected by the Sixth Amendment, is not absolute and is subject to several limitations. To bolster its claim Grace cites *Taylor,* in which the Supreme Court stated: "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence." 484 U.S. at 410, 108 S.Ct. 646.

Grace's effort to devaluate the right to present evidence in relation to the right to confront witnesses is unpersuasive. Both rights are found in the Sixth Amendment and the Supreme Court has never suggested that one is more crucial to procedural fairness or more protective of the presumption of innocence than the other. To the contrary, the Court in *Taylor* made clear that no such hierarchy exists among the rights protected by the Sixth Amendment, stating, "The right of the defendant to present evidence 'stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the states.'" *Id.* at 409, 108 S.Ct. 646; *see also,* Peter Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv. L.Rev. 567, 628 (1978) ("[W]hatever balance is struck between the interests of the defendant and the interests of the state, the outcome should be identical whether the accused's sixth amendment claim arises in the context of his right to be confronted with the witnesses against him or his right to obtain witnesses in his favor."). The right to confrontation is not

a categorical right as Grace has argued. The Supreme Court recognized this, stating in *Chambers:* "Of course, the right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." 410 U.S. at 295, 93 S.Ct. 1038. Grace has failed to show why the balancing test and supporting principles articulated in *Murdoch* should not apply with the same force in a case involving the defendant's right to present evidence. It would be anomalous to argue that the Sixth Amendment right to defend is limited to challenging the government's case by confrontation and cross-examination of witnesses but does not extend to presenting exculpatory proof that could provide a defense to one or more counts of the indictment.

The Supreme Court and Ninth Circuit authority cited above set forth the principles to evaluate the individual Defendants' *ex parte* submissions. The nature and content of the privileged evidence must be weighed against the purposes served by the attorney-client privilege to determine whether any of the documents are of such value as to require Grace's rights under the attorney-client privilege to yield to the individual Defendants' Sixth Amendment right to present evidence.

**b. Admissibility of Grace's privileged documents**

 The individual Defendants want to use evidence of Grace's privileged communications for a number of purposes, including showing that one or more of them lacked knowledge of criminal wrongdoing; showing that a particular defendant was not involved in certain aspects of company decision-making relating to the

charges; and to prove an individual defendant's lack of intent to defraud. But the primary purpose for which the individual Defendants intend to use Grace's attorney-client privileged documents is to establish a defense based on the advice of counsel. A defendant who seeks and reasonably relies in good faith upon the advice of counsel may "not be convicted of a crime which involves wilful and unlawful intent." *Williamson v. United States,* 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278 (1908). Advice of counsel is not a distinct defense to any crime but is instead an indicator of good faith that may be considered by the trier of fact in deciding the issue of intent. *Bisno v. United States,* 299 F.2d 711, 719 (9th Cir.1961). To warrant an instruction on advice of counsel, a defendant must show that he presented all material facts to his attorney and acted in good faith in accordance with the advice he received. *United States v. Ibarra–Alcarez,* 830 F.2d 968, 973 (9th Cir.1987).

I have reviewed the privileged documents and supporting materials submitted *ex parte* by the individual Defendants. Based on that review it appears that each of Defendants Bettacchi, Stringer, Wolter, Eschenbach and Favorito has submitted documents that may, depending on the proof at trial, be of such probative and exculpatory value as to compel admission of the evidence over Defendant Grace's objection as the attorney-client privilege holder. It is not necessary or prudent to decide now which of the submitted documents will be admissible at trial. Such determinations will be made on a document-by-document basis at trial, where the probative value of each bit of evidence can be evaluated in the context of the government's case and in light of what the evidence shows.[15,16] For purposes of the

---

**15.** While some documents appear to be of such value as to require that Grace's privilege

yield, those documents are few in number

motions to sever, it is only necessary to decide whether some of each individual Defendant's privileged documents appear to be admissible. That question is resolved in the affirmative.

The likely result of my review of the proposed evidence is that Grace's interest in the confidentiality of its attorney-client communications and attorney work product will be sacrificed in limited instances. I do not suggest a blanket waiver nor would such a rule be warranted under existing case law. My ruling establishes the outcome that Grace understandably sought to avoid in filing its Statement Regarding the Attorney–Client Privilege (Doc. No. 445). Grace noted that it is also involved in civil litigation and expressed a concern that it will be deemed to have waived its privilege with respect to any documents or communications that are admitted at this criminal trial. *Id.* at p. 1 n. 1. Even if its claim to the privilege remains intact, Grace argues that the privilege "would have little practical value given the broad dissemination of any privileged materials admitted at trial." *Id.*

If some of Grace's privileged communications are introduced at trial, the dissemination of the exhibits beyond their presentation to the jury can be discussed. Ordinarily in any trial exhibits are released to the parties at the conclusion of the case and it is up to the producing party to preserve and protect the exhibit for purposes of appeal or any other reason.

 The government is wrong in arguing that the individual Defendants, none of whom presently hold any position of authority in the corporation, can waive Grace's claim to the attorney-client privilege. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (waiver of the privilege "must necessarily be undertaken by individuals empowered to act on behalf of the corporation"). It is the company's current managers, not displaced managers, who have control over the assertion of the privilege. *Id.* at 349, 105 S.Ct. 1986. This is the case regardless of whether the communication at issue occurred during the tenure of previous management. *Id.*[17]

relative to the total number of documents submitted for *in camera* review.

**16.** To facilitate speedy determination as to the admissibility of Grace's attorney-client privileged communications at trial, the individual Defendants will be required to notify the Court in writing at least two days in advance of their intent to introduce any such communications. The notice shall be filed *ex parte* and shall include (1) a copy of the privileged document or a summary of the privileged testimony to be offered; (2) a short explanation, not to exceed two pages, of the relevance of the document to the defense; (3) the attachment or exhibit number of the document as submitted in conjunction with the instant motions as well as the trial exhibit number; and (4) where a defendant intends to offer testimony, the attachment or exhibit number of any related documents submitted in conjunction with the instant motions. The notice

shall not be electronically filed but instead filed in hard copy along with any attachments and accompanied by a notice of conventional filing. For purposes of these notices only, the parties will not be required to seek leave to file under seal. All notices will be scanned and filed under seal in the electronic docket. A defendant may file a single notice for two or more closely related exhibits or communications.

**17.** Grace has not waived its privilege by allowing the individual Defendants access to the documents pursuant to a joint defense agreement. Co-defendants sharing information pursuant to such an agreement retain the right to assert the attorney-client privilege over the information shared. *See United States v. Henke,* 222 F.3d 633, 637 (9th Cir. 2000) (a joint defense agreement creates an implied attorney-client relationship with the

Nor does this case present an instance in which the privilege is impermissibly used as "both a sword and a shield." The Ninth Circuit has held that a defendant claiming to have relied upon the advice of counsel cannot selectively waive the attorney-client privilege with respect to communications that tend to show that he relied upon advice of counsel while simultaneously refusing to disclose other communications pertaining to the same subject. *United States v. Ortland,* 109 F.3d 539, 543 (9th Cir.1997) (quoting *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162 (9th Cir.1992)). In such cases, the Circuit has held, the defendant uses the privilege as a "sword" to attack the case against him and as a "shield" to prevent the disclosure of communications that might undermine the advice of counsel defense. *Id.* This tactic is impermissible where it denies the opposing party an opportunity to view "the very information [it] must refute." *Chevron,* 974 F.2d at 1162. The problem observed in *Chevron* and *Ortland* is not present here because unlike those cases, in this case the sword and the shield are wielded by different parties. Where a single defendant claims to have relied upon advice of counsel but uses the privilege to keep related communications from his opponent, the defendant gains an unfair tactical advantage by taking two incompatible positions. The strong incentive for a single defendant to engage in such gamesmanship requires that it be discouraged and prohibited where necessary. But where, as in this case, separate parties pursuing their own interests take incompatible positions resulting in the same problem, the need to prohibit tactical behavior is absent.

The government surmises that the Defendants have collectively orchestrated their current conflict in order to win severance for the individual Defendants. Govt.'s Br. at pp. 5–6. The suspicion is that Grace will vigorously oppose the introduction of its privileged communications at a joint trial but will stand down and allow its privileged communications to be introduced freely at a separate trial for the individual Defendants. *Id.* I have looked at the documents in question and there is no basis in my view for concluding that Grace's stated intent to invoke its attorney-client privilege is part of an elaborate ploy to facilitate a severed trial for its co-defendants.[18] To the contrary, Grace has clearly proclaimed an intent to assert its attorney-client privilege at a severed trial to which it is not a party. Grace's Statement at p. 1.

---

co-defendant and therefore is considered an extension of the attorney-client privilege).

**18.** This is not to say that the individual Defendants' professed need for severance on this basis is not to some degree manufactured. The individual Defendants seek the introduction of evidence in which Grace holds a privilege; from their perspective, then, their desired outcome is fully achieved if the Court allows Grace's privileged communications into evidence. It would seem to be irrelevant to the individual Defendants whether that evidence is introduced at a joint trial with Grace present or a severed trial without the company. The choice is no doubt important to Grace, but does not have any particular bearing on the rights of the individual Defendants.

Presumably, a motion in limine would have been sufficient for the individual Defendants to argue their need for the privileged communications. Nonetheless, each of the individual Defendants filed a motion to sever on this basis and took the noble and rather extraordinary step of arguing on *Grace's* behalf for a severance. *See* Eschenbach's Br. at pp. 10–11; Favorito's Br. at pp. 17–18; Wolter's Br. at p. 11; Stringer's Br. at pp. 8–13; Bettacchi's Br. at pp. 14–17. These tactics suggest that while the individual Defendants have stated other plausible grounds for severance, the argument for severance based on the need to facilitate the admissibility of privileged documents is to some extent a pretext.

■ Grace has asserted its legitimate interest in protecting its privileged communications unconditionally and in good faith. Still, the law requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights. In any instance in which privileged communications are admitted, the Court will make clear that the privilege is abrogated over Grace's objection and that the compelled trial disclosure does not constitute a blanket waiver of Grace's attorney-client or attorney work product privileges. *See Transamerica Computer Co., Inc. v. Int'l Bus. Machs. Corp.*, 573 F.2d 646, 651 (9th Cir.1978) (stating the generally accepted principle that "waiver cannot result from compelled production").

Because some of the privileged documents at issue here are likely to be admissible under the principles discussed above, it is necessary to consider whether that likelihood means that Grace must be tried separately from those individual Defendants seeking to rely Grace's privileged communications in their defense.

#### c. Prejudice to Grace's trial rights

■ The individual Defendants insist that any introduction at trial of document in which Grace claims a privilege creates an absolute requirement that Grace's trial be severed from that of the individual Defendants. In support, they rely upon two cases from other jurisdictions: *United States v. White*, 887 F.2d 267 (D.C.Cir. 1989), and *United States v. Walters*, 913 F.2d 388 (7th Cir.1990). These cases are not binding authority in this circuit. Moreover, my reading of them does not convince me that even if I followed them the Defendants would be severed for trial in this case.

In *White*, the D.C. Circuit Court of Appeals reviewed convictions arising out of an improper relationship between a government official and a private company. 887 F.2d 267. White, the sole shareholder of the company, arranged for Finotti, a federal official, to serve as a consultant for the company in exchange for a monthly fee. *Id.* at 268. At trial, Finotti introduced evidence of a conversation between Finotti, White and White's counsel in which White's counsel told Finotti that the arrangement would be legal if Finotti received approval from his superiors. *Id.* at 269. Finotti introduced the evidence in support of his theory that he was misled by White's counsel into taking part in the deal. *Id.* In response to Finotti's evidence the prosecution introduced, over White's objection, evidence of a later privileged conversation between White and his counsel with Finotti absent in which White's counsel told White that the contemplated arrangement would be illegal regardless of whether Finotti secured the approval of his superiors. *Id.*

The trial court admitted evidence of the second conversation on alternative bases. The relevant reason of concern here is that Finotti had "opened the door" to introduction of the later conversation by putting into evidence the first conversation. *Id.* The court of appeals rejected the justification, explaining that it was Finotti, not the privilege-holder White, who introduced the first conversation. *Id.* at 270. Because White did not attempt to rely on advice of counsel, the court held that there had been no waiver of White's attorney-client privilege. The court wrote:

> The prosecution may not gain, through the device of a joint trial, admission against one defendant of otherwise inadmissible evidence on the happenstance that the door to admitting the evidence has been opened by a co-defendant.... If the district court believed that the evidence of the morning conversation,

while crucial to Finotti's defense, would mislead the jury in White's favor unless clarified by the later conversation, the court should have severed the trials.

*Id.* (citations omitted).

The case at hand does not present the problem at issue in *White*. The privilege-holder in *White* suffered acute prejudice to his trial rights through the introduction of his privileged conversation. The evidence that White's lawyer had told him the arrangement was illegal had direct bearing on the question of White's criminal intent, the presence of which the government was required to prove beyond a reasonable doubt as an element of the offense. I have reviewed the privileged documents submitted by the parties in this case as well as the supporting affidavits regarding expected testimony. Based on that review I am satisfied that with two exceptions, Grace's privileged evidence, if admitted, will not work to prejudice the company's trial rights; any such evidence would be probative of an individual Defendant's innocence and not of Grace's guilt.[19]

Where the privileged evidence has no bearing on Grace's guilt or innocence, the injury to Grace from its disclosure is confined to the erosion of Grace's right to confidentiality. The harmful effects of disclosure are felt equally regardless of whether Grace is present for its introduction at trial. This means there is nothing to be gained by severance. The court in *White* stated, "We reverse White's conviction because a central piece of evidence *against* him was protected by the attorney-client privilege." 887 F.2d at 269 (emphasis added). Because the privileged evidence, if introduced, would not be evidence *against* Grace, *White* does not compel severance in this case.

In *Walters*, two entrepreneurs, Walters and Bloom, devised a scheme to entice collegiate athletes into secret sports agency agreements in violation of National Collegiate Athletic Association ("NCAA") rules. 913 F.2d at 390. The athletes were required to lie on NCAA eligibility paperwork about their amateur status. *Id.* at 389. When their ill-gotten clients sought to back out of the agency agreements, Walters and Bloom threatened them in an effort to enforce the contracts. *Id.* at 390. The two were convicted on charges of mail fraud, RICO violations and conspiracy. *Id.* at 389.

At the trial, Walters attempted to rely on advice of counsel to show that he lacked the requisite criminal intent for the charged offenses. The legal advice Walters sought to introduce came from a law firm he and Bloom visited prior to beginning their enterprise. *Id.* at 390. According to the testimony, the law firm's sports law department told Walters and Bloom that the scheme they were contemplating, while violative of NCAA regulations, was not against the law. *Id.* Bloom argued that Walters' introduction of counsel's advice forced Bloom to waive his attorney-client privilege and he requested severance on that basis, which was denied. *Id.* at 392.

The Seventh Circuit reversed, holding that the district court abused its discretion in refusing to sever the trials. The court explained that although Bloom and Walters were both privilege holders, Walters could not waive the privilege on Bloom's behalf. The court described the prejudice to Bloom as follows:

> Bloom was forced to observe his own attorneys testify about the intimate dis-

---

**19.** The exceptions lie with the privileged materials submitted by Defendants Favorito and *Stringer,* discussed in greater detail below.

cussions to which he had been a party. Bloom could not pursue his own defense, but was forced to skittle along behind that of Walters. Details which Bloom chose to share with his attorney were not available to the prosecution and broadcast to the jury.... Once Walters pursued his advice-of-counsel defense, as was his right, Bloom must have been provided the option of a separate trial. Any other course forced Bloom to waive his attorney-client privilege. We cannot tolerate such devil's bargains.

*Id.* at 393.

The individual Defendants urge the Court to follow the reasoning of *Walters* and find that the introduction of evidence in which Grace claims a privilege automatically requires severance. I have more discretion than that. *See Ponce*, 51 F.3d at 831. The decision whether to sever must be made within the confines of Rule 14, and in resolving the question the Court must focus primarily on two considerations: judicial economy and unfair prejudice.

The Seventh Circuit's opinion in *Walters* does not explain why it is always unfairly prejudicial for a criminal defendant to see his attorney-client privilege breached in a trial in which he is a party. The closest the court comes to explaining how Bloom's trial rights were affected is to say that Bloom was prevented from pursuing his own defense and was forced to "skittle along" behind Walters' advice of counsel defense. 913 F.2d at 393. Nowhere does the court in *Walters* say that the privileged evidence has the effect of making Bloom appear more guilty. The *Walters* court stated, "Where, as here, the attor-

ney-client privilege is compromised by joint trials, we must rule on the side of severance." *Id.* at 393. Presumably, though, Walters would want to introduce the same attorney-client conversations at his severed trial, meaning Bloom's privilege would still be compromised. The question the *Walters* opinion fails to answer is this: What greater injury does Bloom suffer at a joint trial over that which he suffers from the disclosure of his confidential communications at Walters' separate trial?

If the individual Defendants in this case succeed in showing that their Sixth Amendment rights require disclosure of Grace's privileged communications, Grace's attorney-client privilege will yield. The Court put the question to each Defendant's counsel at oral argument, asking what injury Grace suffers from introduction of the privileged evidence at a joint trial that it does not also suffer from the introduction of the same evidence at a severed trial. Each responded that only through severance would Grace be spared the prejudice of having its attorney-client communications used against it at trial, suggesting that the individual Defendants assume the communications will incriminate Grace.[20] As noted above, with the exception of evidence provided by Defendants Favorito and Stringer, there is no risk of prejudice to Grace's trial rights from the introduction of the documents submitted for *in camera* review.

The other factor for the Court to consider, and the one underlying Rule 8(b)'s preference for joint trials, is judicial economy. The trial of the defendants in *Walters* lasted one month. Had the defen-

**20.** At oral argument, counsel for Defendant Wolter accused the prosecution of cynically seeking to do as much violence as possible to Grace's rights by advocating for abrogation of Grace's privilege at a joint trial. Is there less

cynicism in the individual Defendants' argument that Grace's attorney-client privilege, while far too precious to be breached at a joint trial, may readily yield to meet the individual Defendants' needs at a severed trial?

dants been severed as the court of appeals suggested, the case would have required no more than two months of courtroom time. Trial in this matter may last up to four months. That estimate is due to extensive expert testimony relating to the Count I conspiracy in which all Defendants are charged. Severance means that testimony would have to be presented anew at each trial. It follows that severed trials, while perhaps somewhat shortened by the reduction in the number of parties, will each last two months or more.

Having considered the presumption in favor of joint trials, the strong interest of judicial economy in consolidating defendants in a case of this size, and the absence of unfair prejudice to Grace's trial rights from the introduction of evidence in which it claims a privilege, I find that Defendants Eschenbach, Bettacchi and Wolter have failed to show that severance is warranted under Rule 14.

The motions to sever filed by Defendants Favorito and Stringer present an exception to this analysis. Defendant Stringer has submitted documents of significant exculpatory value the admission of which is incompatible with Grace's right to a fair trial, necessitating Defendant Stringer's severance. As Grace's in-house counsel, nearly all of Favorito's conduct relevant to these charges is protected by Grace's attorney-client privilege. Moreover, the materials Favorito intends to offer to attempt to show his innocence must necessarily put him at odds with those he advised, including the company and its managers, some of whom are his co-defendants. A joint trial involving Favorito presents a heightened likelihood of antagonistic defenses and a near certainty that a defendant will seek to introduce evidence that incriminates one or more of his co-defendants. Irreconcilable conflicts between the Defendants' trial rights could

emerge weeks into the proceeding, necessitating retrial of some Defendants at a huge cost in terms of time and resources. The joint trial does not serve its intended purpose of promoting judicial economy where there is so great a likelihood of unfair prejudice to at least one Defendant.

The risk of prejudice from Favorito's *ex parte* submissions does not extend to Defendant Stringer, however. A thorough review of the documents submitted by each Defendant indicates that Favorito and Stringer may be tried together without prejudice to the trial rights of either one. Accordingly, Rule 14(a) dictates that Defendants Favorito and Stringer be severed and tried together, apart from their co-Defendants.

### III. Order

Based on the foregoing, IT IS HEREBY ORDERED:

(1) The motions to sever by Defendants Wolter, McCaig, Eschenbach, Bettacchi and Walsh (Doc. Nos. 344, 352, 368, 370 and 372) are DENIED. These Defendants will be tried jointly with Defendant Grace as scheduled on September 11, 2006.

(2) The motions to sever by Defendants Favorito and Stringer (Doc. Nos. 350 and 363) are GRANTED. These Defendants will be tried jointly on March 19, 2007 in Missoula, Montana at 8:30 a.m.

(3) Each individual Defendant must notify the Court in writing at least two days in advance of his intent to introduce communications over which Defendant Grace claims a privilege. The notice shall be filed *ex parte* and shall include (1) a copy of the privileged document or a summary of the privileged testimony to be offered; (2) a short explanation, not to exceed two pages, of the relevance of the document to the defense; (3) the attachment or exhibit number of the document as submitted in conjunction with the instant motions as

well as the trial exhibit number; and (4) where a defendant intends to offer testimony, the attachment or exhibit number of any related documents submitted in conjunction with the instant motions. The notice shall not be electronically filed but instead filed in hard copy along with any attachments and accompanied by a notice of conventional filing and notice that the document is to be sealed. For purposes of these notices only, the parties will not be required to seek leave to file under seal. A defendant may file a single notice for two or more closely related exhibits or communications.