**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Norby WALTERS and Lloyd Bloom,
Defendants–Appellants.**

**Nos. 89–2352, 89–2353, 89–3285
and 89–3286.**

United States Court of Appeals,
Seventh Circuit.

Argued May 8, 1990.

Decided Sept. 17, 1990.

Rehearing Denied Nov. 29, 1990.

Tyrone C. Fahner, Mayer, Brown & Platt, Matthew F. Kennelly, Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., Robert Gold, Gold & Wachtell, New York City, Andrew Frey, Kerry E. Cormier, Mayer, Brown & Platt, Washington, D.C., Stuart E. Abrams, Mayer, Brown & Platt, New York City, for Norby Walters.

Steven F. Molo, George C. Lombardi, Dan K. Webb, Winston & Strawn, Chicago, Ill., for Lloyd Bloom.

Before BAUER, Chief Judge,
MANION, Circuit Judge, and
ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

Norby Walters and Lloyd Bloom were sports agents who specialized in representing college football players. Walters and Bloom would recruit young players still in college and secretly sign them to exclusive representation contracts. The players would then lie about the existence of their contracts on the amateur athletic eligibility forms they submitted to their universities. The athletes would then continue to receive scholarships from these universities and play football on the schools' teams. Walters and Bloom were convicted on charges of mail fraud, RICO violations and conspiracy for their participation in this scheme. They now appeal to this court, contending that several errors were committed during their trial that should render their convictions invalid. We believe that fundamental errors occurred at trial which prejudiced the defendants' ability to receive a fair trial. We, therefore, reverse and remand with instructions for a new trial.

## I. BACKGROUND

Norby Walters, a former nightclub owner, and Lloyd Bloom, a 25–year-old, self-described salesman, together formed World Sports & Entertainment ("WS & E") in August 1984. In the past, Walters had represented entertainers such as the Jackson Five, Dionne Warwick and The New Edition. With their new enterprise, Bloom and Walters hoped to make the transition

Thomas M. Durkin, Robert S. Rivkin, Asst. U.S. Attys., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Office of the U.S. Atty., Chicago, Ill., for plaintiff-appellee.

from managing musical entertainers to representing professional athletes.

Walters and Bloom would entice talented college football players to sign exclusive representation contracts with WS & E by providing signing bonuses in cash, no-interest loans, sports cars and other incentives. As it was in the interest of both the agents and their clients for the players to retain their college eligibility, the contracts were post-dated and the agreements were kept secret by both sides.

The National Collegiate Athletic Association ("NCAA") forbids players from signing with an agent or receiving compensation for athletics before the expiration of collegiate athletic eligibility. An athlete who violates these rules is considered to have waived his eligibility in return for payment, and can no longer compete in college athletics. Schools who are members of the NCAA require their players to submit forms testifying to the lack of such restrictions on their eligibility. The forms are then filed with the NCAA. Thus, the players who had signed agreements with Walters and Bloom would lie to their colleges on these eligibility forms in order to continue to receive scholarships and to play for their school teams.

Prior to beginning their enterprise, in January 1985, Walters and Bloom consulted with attorneys at the law firm of Shea & Gould in New York concerning the possible legal ramifications of these agreements. Lonn Trost, the head of the sports law department at Shea & Gould, informed the agents that while they were violating NCAA rules by signing athletes who then continued to play for their college teams, they were not violating any laws. Trost and other attorneys at Shea & Gould admit that they were aware that athletes would probably have to conceal this arrangement from their universities. They contend, however, that they were not aware that the athletes would lie openly on their NCAA eligibility forms.

Walters and Bloom were much more successful recruiters than agents or negotiators. In all, 58 college football players entered into representation agreements with WS & E. Only two players, however, continued the relationship after graduation from college. The vast majority felt cheated by Walters' and Bloom's clandestine tactics and signed with other agents prior to the NFL draft. Walters and Bloom again consulted with Shea & Gould to consider enforcement of the contracts. The agents were out not only their anticipated representation fees, but the loans they had made to the players up front. Their attorneys believed that the contracts were enforceable, but recommended against litigation. The government alleges, and several former clients testified, that Walters and Bloom personally threatened them in an attempt to enforce these contracts. One player, Maurice Douglas, was told his legs would be broken before the NFL draft if he did not repay his loan to WS & E.

On August 24, 1988, Walters and Bloom were charged in a seven-count indictment with mail fraud, RICO violations, and conspiracy in the Northern District of Illinois.[1] Count I alleged conspiracy to engage in a pattern of racketeering activity, and Count VII alleged substantive violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), specifically 18 U.S.C. § 1962(c) & (d). The predicate acts for these RICO charges included extortion, attempted extortion, mail fraud, wire fraud, collection of credit by extortionate means, and the use of interstate facilities in the furtherances of unlawful activity. Counts II–V separately charged the defendants with substantive mail fraud counts against the University of Michigan, Michigan State University, the University of Iowa and Purdue University, respectively, in violation of 18 U.S.C. § 1341. Count VI alleged conspiracy to commit mail fraud in violation of 18 U.S.C. § 371.

A jury trial was held before Judge George M. Marovich from March 6, 1989 through April 6, 1989. After a week of deliberation, the jury found Walters and Bloom guilty on five of the seven counts.

---

**1.** A superseding indictment was filed February 1, 1989, making several changes to the content of the counts. None of the changes are relevant here.

The defendants were found not guilty of mail fraud against two of the universities under Counts III and IV. In a special verdict, the jury indicated that it did not find that Walters or Bloom had committed the extortion-related charges. On June 19, 1989, Judge Marovich sentenced Walters to five years in custody to be followed by five years probation. Bloom received a three-year sentence to be followed by five years probation. Both defendants moved for a new trial and upon the denial of this motion filed a timely notice of appeal.

## II. DISCUSSION

On appeal, Walters and Bloom raise a series of challenges to the procedures followed at their trials. Two of these issues—the refusal by the court to tender an instruction that Walters' actions may have been predicated on the advice of counsel and the denial of Bloom's motion for severance—were sufficiently prejudicial to the defendants to warrant reversal of their convictions and a new trial.

### A. Walters' Advice-of-Counsel Instruction

▆ The linchpin of Walters' defense was that his actions were taken in good faith based upon the advice of his attorneys. If the jury accepted this characterization of the events, Walters could not have been considered to have formed the specific intent necessary to commit fraud upon the universities. *See United States v. Martin–Trigona*, 684 F.2d 485, 492 (7th Cir.1984) ("good faith, or the absence of an intent to defraud, is a complete defense to a charge of mail fraud.") This court has often stated, "[t]he defendant in a criminal case is entitled to have the jury consider any theory of the defense which is supported by the law and which has some foundation in the evidence, however tenuous." *United States v. Briscoe*, 896 F.2d 1476, 1512 (7th Cir.1990). *See also United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986); *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir.1969). On appeal, therefore, we must determine whether the evidence supports Walters' theory of good faith reliance on the advice of his counsel.

*See United States v. Kelley*, 864 F.2d 569, 572 (7th Cir.1989).

In January of 1985, Walters met with attorneys at Shea & Gould. In March of that year, he began signing his first clients. Walters' discussions with counsel, therefore, predated the actions taken in violation of the NCAA rules. The government vigorously contends that Walters did not reveal to his attorneys that his clients would lie on eligibility forms. By not revealing this material fact, the prosecution argues, Walters cannot now raise the advice-of-counsel defense. Walters, however, stresses that he was not aware of these forms.

Both sides admit that Walters' counsel informed him that although he would be violating NCAA rules by concealing the early recruiting of these athletes, he would not break the law by signing these concealed arrangements. It is not unreasonable to assume that the sports law experts at Shea & Gould would be aware of the eligibility forms required of athletes by universities and the NCAA. Nor would it have been unreasonable for those attorneys to have considered how these forms might be addressed by Walters' technically ineligible clients. The lack of discussion could signal that Walters was unaware of the forms or that the Shea & Gould attorneys tacitly considered these forms in issuing their legal opinion.

The one possibility accepted by the court—that Walters simply chose to lie to his attorneys about his plans—seems patently unreasonable. Walters, by all accounts, was a rather unethical and unsavory businessman. He frequently operated outside the boundaries of truth and honesty. Yet, this does not persuade us that he would conceal material information from his attorney. Walters apparently sought out Shea & Gould *because* he feared that his actions might be illegal. Such a client is more likely to reveal all relevant information than one unconcerned by the consequences of his acts.

The trial court, however, is the place to make these determinations; it is not for us to determine whether Walters actually concealed material information from his attor-

neys. Whether Walters did conceal such information or not, however, the fact remains that there is substantial doubt about the circumstances of his legal advice. Such questions must be resolved by the jury—not the court. If Walters demonstrated evidence that he had provided to his attorneys all material information known to him, then the court must at least tender an instruction on the advice-of-counsel defense. We believe Walters presented sufficient evidence on which to support his theory of defense. He deserved an instruction explaining this theory. Nor can "arguments of counsel ... substitute for instructions by the court[.]" *Taylor v. Kentucky*, 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936–37, 56 L.Ed.2d 468 (1978). Amid a sea of facts and inferences, instructions are the jury's only compass. Here, they were cast adrift. The court's failure to provide an instruction on Walters' theory of defense infected the fairness of his trial. Walters established the basis for such a defense and deserved such an instruction. The refusal to provide an advice-of-counsel instruction was therefore reversible error.

### B. Bloom's Motion for Severance

Bloom contends that Walters' pursuit of an advice-of-counsel defense forced him to waive his attorney-client privilege. He therefore requested severance under Fed. R.Civ.P. 14. The court denied this request, stating that the privilege was held by WS & E as a corporate entity and not by Bloom individually. Under the court's approach, Walters, as the president of WS & E, was free to waive the attorney-client privilege surrounding all WS & E communications in pursuing his advice-of-counsel defense. Bloom now contends that this denial of his motion to sever was reversible error.

A decision not to sever the trials of co-defendants "is one within the sound discretion of the trial court and should be overturned only if it is found to be a clear abuse of discretion." *United States v. Penson*, 896 F.2d 1087, 1094 (7th Cir.1990). Moreover, the defendant bears the burden of demonstrating that he was prejudiced by the denial of severance. *See United States v. Oglesby*, 764 F.2d 1273, 1275–76 (7th Cir.1985). We have held, however, that severances are called for where the defenses of codefendants are "mutually antagonistic" or "irreconcilable ... [such] that the acceptance of one party's defense will preclude the acquittal of the other." *United States v. Briscoe*, 896 F.2d 1476, 1518 (7th Cir.1990). Even where defenses are not mutually antagonistic, a severance may be granted "if the actual conduct of one defendant's defense unduly prejudices his or her co-defendant." *See United States v. Mazzanti*, 888 F.2d 1165, 1172–73 (7th Cir. 1989); *United States v. Rollins*, 862 F.2d 1282, 1290 (7th Cir.1988).

■ The first issue we must resolve is whether an attorney-client relationship existed between Shea & Gould and Lloyd Bloom as an individual or whether Shea & Gould simply represented the corporate entity of WS & E. According to the testimony, Walters and Bloom approached the attorneys for civil, administrative and *criminal* law advice. Shea & Gould did not merely provide information about how to draft representation contracts, but offered opinions about the criminality of Walters' and Bloom's actions. The agents were informed that although they were violating NCAA rules they were not breaking any laws. This court has stated that determination of the existence of the attorney-client privilege "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.1978). Bloom confided highly personal information about his activities to his lawyers in order to secure their opinions about the criminal ramifications of these acts. He was acting as an individual, not an officer of a corporation, at that time. We believe the attorney-client relationship was established under these circumstances. The communications between Bloom and his attorneys at Shea & Gould are therefore privileged. Only Bloom, not Walters, could waive this privilege.

■ This does not end our inquiry, however. Next we must determine whether Bloom's trial was prejudiced by the violation of this privilege. We believe that such prejudice did occur. When Walters pursued his advice-of-counsel defense, Bloom was forced to observe his own attorneys testify about the intimate discussions to which he had been a party. Bloom could not pursue his own defense, but was forced to skittle along behind that of Walters. Details which Bloom chose to share with his attorney were not available to the prosecution and broadcast to the jury. Bloom's counsel did not wish to pursue the advice-of-counsel gambit with Walters. In fact, Bloom's counsel stated to the court that Walters' theory had "gone over like a lead balloon" with the jury. Given that prejudicial error occurred in Walters' defense, we are persuaded that Bloom was prejudiced as well. Walters' conduct of defense "unduly prejudiced his ... co-defendant." *Mazzanti*, 888 F.2d at 1173.

The attorney-client privilege ranks high among the precious gems of our adversary system of justice. We should not allow it to be tarnished so easily. We recognize that joint trials are an essential element of the quick administration of justice. If every defendant who wanted a severance was given one, the slow pace of our court system would go from a crawl to paralysis; any motion for severance must be balanced against the need for judicial economy. Here, no such balance can be reasonably struck. Where, as here, the attorney-client privilege is compromised by joint trials, we must rule on the side of severance. Once Walters pursued his advice-of-counsel defense, as was his right, Bloom must have been provided the option of a separate trial. Any other course of action forced Bloom to waive his attorney-client privilege. We cannot tolerate such devil's bargains. The denial of Bloom's motion for severance under these circumstances was outside the court's discretion. Bloom must be given another trial in which to pursue his own defense free from that of his co-defendant.

## III. CONCLUSION

The court erred by not providing an advice-of-counsel instruction to the jury as requested by Walters. Walters reasonably developed this defense and he deserved to have the jury, not the court, determine its validity. He was substantially prejudiced by the omission. Moreover, as Walters pursued this advice-of-counsel defense, this necessarily compromised Bloom's attorney-client privilege. Only Bloom could properly waive this privilege. He did not. The denial of his motion for severance, therefore, was reversible error. Because we reverse on these issues, we do not reach the remaining contentions raised by the defendants.

REVERSED AND REMANDED WITH INSTRUCTIONS TO PROCEED ACCORDING TO THE INSTRUCTIONS CONTAINED HEREIN.