[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14654

_____

D.C. Docket No. 2:17-cr-00419-AKK-TMP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID LYNN ROBERSON,
JOEL IVERSON GILBERT

Defendants-Appellants,

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(May 27, 2021)

Before WILSON and BRANCH, Circuit Judges, and RESTANI,[*] Judge.

RESTANI, Judge:

---

[*] The Honorable Jane A. Restani, United States Judge, U.S. Court of International Trade, sitting by designation.

The case involves the Defendants-Appellants' concealed payments of hundreds of thousands of dollars to an Alabama Representative through his charitable foundation in exchange for "advocacy" and "community outreach" intended to undermine the Environmental Protection Agency's ("EPA") efforts to clean up a Superfund site. The Defendants-Appellants were convicted of bribery under 18 U.S.C. § 666(a)(2), among other charges, following a month-long trial with numerous witnesses, including the Representative himself, and hundreds of exhibits. Defendants-Appellants claim, *inter alia*, that the convictions should be overturned because no reasonable jury could find that the Representative committed an "official act," an element required of a different flavor of federal bribery–18 U.S.C. § 201. The court concludes that the district court was correct not to equate these two federal statutes and that the Appellants' remaining arguments regarding the jury instructions and the district court's decision not to sever the Appellants' trial are unavailing. The judgments of conviction are affirmed.

## BACKGROUND

Joel Gilbert ("Gilbert"), a partner at Balch & Bingham LLP ("Balch"), and David Roberson ("Roberson"), a lobbyist and Vice-President of Governmental Affairs at Drummond Company ("Drummond"), appeal their guilty verdicts following a joint jury trial for conspiracy, 18 U.S.C. § 371; bribery (aiding and abetting), *id.* at §§ 2, 666(a)(2); honest services wire fraud (aiding and abetting), *id.*

at §§ 2, 1343, 1346; and money laundering conspiracy, *id.* at § 1956(h). Gilbert and Roberson were involved in a scheme to thwart the EPA's efforts to expand the geographical area of the 35th Avenue Superfund site ("35th Avenue site") and the EPA's proposed addition of the site to the National Priorities List ("NPL") by paying Alabama Representative Oliver Robinson ("Representative Robinson") to act counter to these efforts.[1] In particular, the government highlighted three actions by Representative Robinson as violative of 18 U.S.C. § 666: (1) Representative Robinson attended a local EPA meeting with talking points about the Superfund site and its potential expansion, prepared by Gilbert, (2) Representative Robinson requested to attend and spoke at a meeting of the Alabama Environmental Management Commission ("AEMC") to promote Drummond's position against the EPA, and (3) Representative Robinson voted a resolution out of the Alabama House of Representative's Rules Committee, which was drafted by Gilbert, opposing the EPA's activities in Alabama.

The 35th Avenue site is in North Birmingham, Alabama. Prior to the events at issue, the EPA established the 35th Avenue site and found the Walter Coke Company responsible for the pollution. In 2013, however, the EPA sent letters to five companies, including ABC Coke, a subsidiary of Drummond, naming those five

---

[1] Representative Robinson pleaded guilty to bribery, conspiracy to commit bribery, and honest services wire fraud, among other offenses, for his involvement in the scheme.

companies as additional potentially responsible parties ("PRP") for the site's soil contamination. In 2014, following a petition by a local environmental group, the Greater Birmingham Alliance to Stop Pollution ("GASP"), EPA Region 4 in Atlanta began to consider whether the site should be expanded into nearby Tarrant, where ABC Coke is located. The EPA also proposed adding the 35th Avenue site to the National Priorities List ("NPL"), which would allow access to additional federal funds for the cleanup.

To add a site to the NPL, the EPA was required to reach an agreement with the State of Alabama to assure the provision of "all future maintenance of the removal and remedial actions" for the site, "assure the availability of a hazardous waste disposal facility," and pay for, or otherwise assure payment of, ten percent of the cost of the cleanup. *See* 42 U.S.C. § 9604(c)(3). The Alabama Governor at that time, Robert Bentley, delegated the decision on whether to reach an agreement with the EPA to the Alabama Department of Environmental Management ("ADEM"). Although ADEM was the initial decisionmaker on this issue, the AEMC, a body that hears regulatory appeals from ADEM, selects the director of ADEM, implements applicable rules and regulations, and can make recommendations to ADEM, held a hearing attended by the ADEM director. Ultimately, the Alabama Legislature would be required to appropriate any money allocated from the State, if the site was to be listed on the NPL. *See* 42 U.S.C. § 9604(c)(3).

4

Drummond, through Roberson, undertook efforts to hamper the EPA's attempts to expand the site, add it to the NPL, and find ABC Coke responsible for the cleanup costs. These efforts included retaining Balch, and its partner Gilbert, to represent ABC Coke. Using Roberson's preexisting lobbying relationship with Representative Robinson, Gilbert and Roberson enlisted him to help run a "community outreach program" aimed at garnering public support for Drummond's position.[2] In February 2015, Gilbert and Representative Robinson signed an agreement, which established a consulting relationship between Balch and the Oliver Robinson Foundation Inc. ("the Foundation" or "Robinson Foundation"),[3] retroactively effective to December 1, 2014, when Representative Robinson first met with the EPA.[4] The Foundation Contract, which appears to be largely boilerplate, required Representative Robinson to abide by all applicable laws and ethical rules.

---

[2] Representative Robinson testified that he did not fulfill, or even attempt to fulfill, many of the designated outreach efforts listed in the outreach proposal he submitted to Appellants.

[3] Alliance for Jobs and the Economy ("AJE") was incorporated in March 2015. AJE was headed by Roberson, who decided whether to pay Representative Robinson from AJE or Drummond funds that were then routed through Balch before being paid to the Foundation. AJE charged hefty annual membership fees to prominent industries in the area. AJE members testified that they were unaware that Representative Robinson or the Foundation were being compensated through AJE. In fact, Gilbert testified that all the donations and membership fees went to paying the Foundation.

[4] In the September 2015, Robinson's Foundation started a community outreach campaign called "Get Smart Tarrant." This program, run by Representative Robinson's daughter, focused its efforts on portraying the EPA involvement in Birmingham as bad for the local economy and scientifically unreliable. The work continued until May 2016 and was funded by Balch, which was reimbursed by AJE or Drummond as decided by Roberson.

As indicated above, three actions undertaken by Representative Robinson, however, resulted in Roberson and Gilbert's indictment on federal charges.

First, in December 2014, Representative Robinson attended an EPA meeting about its "Make a Visible Difference" campaign with talking points prepared by Gilbert about the 35th Avenue site. Prior to the meeting, Representative Robinson informed Gilbert that he would be meeting with the EPA, which led to Gilbert contacting Roberson, who then approved the request for $7,000 a month for the Foundation, all in the span of a few short hours. Although some of the comments Representative Robinson made at the meeting were seemingly innocuous, others at best displayed a pro-business stance and at worst telegraphed to the EPA that the local business community, and potentially local government, were ready to stymie the EPA's 35th Avenue site efforts.[5] Without informing the EPA officials,

---

[5] For instance, several of the questions read as follows:

> 2. EPA has already made the area a superfund site. Why does EPA want it on the National Priorities List (NPL)? What benefit is there in placing it on the NPL?

> 3. It is my understanding that to put the site on the NPL the state must agree. I've seen media reports that the state does not agree and is going to fight it. Why? What are the impacts of the state not agreeing?

> 4. From what I understand this all started with Walter Coke contaminating the area and they were cleaning it up. If so, why isn't EPA just making them finish the job?

> 5. From what I understand, EPA has identified several other companies it is going after right now to help with the cleanup. Why is there a need to try to bring in all these other companies into this? Seems like the only thing this will do is slow down the clean up because of litigation between all these companies about who is really responsible and them also fighting EPA. Is that not accurate?

6

Representation Robinson recorded audio of the meeting on his iPhone and then sent a copy to Gilbert who forwarded it to Roberson.[6]

Second, Representative Robinson spoke at a public meeting of the AEMC after Gilbert drafted a letter on his behalf requesting permission to speak. Representative Robinson then met with Roberson and Gilbert to discuss the meeting and strategize. The Foundation Contract was signed on February 16, 2015, a few days before the meeting. Representative Robinson then attended the AEMC meeting as a local representative and spoke to the AEMC and an audience including the director of the ADEM, Lance LeFleur ("LeFleur"). Representative Robinson expressed concern regarding the EPA's efforts in his legislative district and sought "answers from [the AEMC] – or the ADEM." Representative Robinson remarked that he did not think expansion of the 35th Avenue site was supported by scientific evidence, that he did not think the area should be listed as a Superfund site or on the NPL, and that finding additional companies liable for the cleanup would harm residents given the "decades of litigation that will occur." At no point did Representative Robinson disclose his affiliation with Drummond, Balch, or the Appellants. Following the meeting, at the behest of Roberson, Representative Robinson sent LeFleur a letter drafted by Gilbert asking for information regarding

---

[6] The roughly thirty-minute recording was played in open court.

7

LeFleur's communications with the EPA and other public officials about the 35th Avenue site.

Third, in May 2015, Representative Robinson helped vote a resolution out of the House Rules Committee, drafted by Gilbert, entitled "Urging Increased Oversight of and Opposition to the EPA's Activities in Alabama" ("SJR-97").[7] As indicated by Gilbert's timesheets, he met with Roberson and Representative Robinson the same day that he drafted the resolution. The resolution described EPA action in the area, in particular regarding the 35th Avenue site, stated that the EPA was operating on the basis of faulty science and was working against ADEM, urged the EPA to reconsider its actions, and asked that ADEM and the Alabama Attorney General "combat the EPA's overreach." The Resolution eventually passed both houses of the Legislature and was signed by the Governor.

Representative Robinson pleaded guilty to his role in the scheme and testified to the events outlined above at Roberson and Gilbert's trial. Representative Robinson's testimony, along with other evidence, led the jury to convict Roberson and Gilbert on all counts.[8]

---

[7] Roberson disputes whether Representative Robinson voted on the measure. The measure passed by voice vote, so there is no written record of the vote, but Representative Robinson admitted during the trial that he voted on the measure.

[8] Appellants were convicted for Count 1: conspiracy, 18 U.S.C. § 371; Count 2: bribery (aiding and abetting), *id.* at §§ 2, 666(a)(2); Counts 3, 4, and 5: honest services wire fraud (aiding and abetting), *id.* at §§ 2, 1343, 1346; and Count 6: money laundering conspiracy, *id.* at § 1956(h).

**JURISDICTION & STANDARD OF REVIEW**

We have jurisdiction under 28 U.S.C. § 1291 of an appeal of a final judgment of conviction. The court reviews *de novo* the sufficiency of the evidence, *see United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (citation omitted), and "interpret[s] the facts in the light most favorable to the government." *United States v. Blankenship*, 382 F.3d 1110, 1116 (11th Cir. 2004) (citation omitted). We review *de novo* whether jury instructions misstated the law or misled the jury. *See United States v. Baston*, 818 F.3d 651, 660 (11th Cir. 2016). The district court's refusal to sever a case is reviewed for abuse of discretion. *See United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007).

**DISCUSSION**

## I.    Sufficiency of the Evidence

Appellants argue[9] that under the standard set forth in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the actions taken by Representative Robinson to promote Drummond's position on the EPA issue do not constitute "official acts" and thus do not satisfy 18 U.S.C. § 666(a)(2)'s requirement that acts be taken "as an agent of Alabama in connection with 'business' of the State." At base, they argue

---

[9] Appellants have adopted portions of each other's briefs. For ease of reference, the opinion refers to such arguments as being made by Appellants and only specifies an individual Appellant when he alone is making an argument.

9

that bribery under § 666 requires an official act as is required for bribery under 18 U.S.C. § 201, the statute at issue in *McDonnell*. According to Appellants, most of the actions undertaken by Representative Robinson were either not official acts or cannot be connected to Appellants.

Appellants additionally claim that because it is unknown which acts the jury relied upon in convicting Gilbert and Roberson, a new trial is required to ensure that the jury did not convict for legal behavior. Appellants contend that Representative Robinson is not an agent of Alabama for the purposes of 18 U.S.C. § 666, because he had no authority over the executive agencies AEMC and ADEM. Finally, Appellants counter the government's "retainer" theory[10] of culpability as unsupported and legally flawed in the wake of *McCormick v. United States*, 500 U.S. 257 (1991) and *United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011) (per curiam).

The phrase "official act" is not in 18 U.S.C. § 666, which criminalizes "[t]heft or bribery concerning programs receiving Federal funds" and reads:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

. . .

---

[10] The "retainer," "as opportunities arise," or "stream of benefits" theory of bribery, occurs when a person bribes an individual or entity in exchange for a continuing course of conduct. *See United States v. Ganim,* 510 F.3d 134, 147–49 (2d Cir. 2007) (detailing a bribery scheme based on an ongoing course of conduct); *see also United States v. Lopez-Cotto*, 884 F.3d 1, 8 (1st Cir. 2018) (same).

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666. Appellants urge the court to read into this statute the "official act"

requirement from 18 U.S.C. § 201,[11] a different federal bribery law covering

---

[11] Like section 666, section 201 penalizes both giving bribes and accepting bribes and the relevant subsection regarding giving bribes says:

(b) Whoever—

(1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—

(A) to influence *any official act*; or

(B) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person;

18 U.S.C. § 201(b)(1) (emphasis added).

"[b]ribery of public officials and witnesses[.]" 18 U.S.C. § 201. We have previously held that 18 U.S.C. § 666 has no such requirement and is distinguishable from 18 U.S.C. § 201:

> The Supreme Court in *Sun–Diamond* concluded that § 201(c) did require a link between the gratuity and a specific "official act" because the statutory text prohibited gratuities given or received "for or because of any official act performed or to be performed" and then defined "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy ...." *Id.* at 406, 119 S. Ct. at 1407 (quoting § 201(c)(1)(A) and (a)(3)). And it was specifically this text of the illegal gratuity statute—"for or because of any official act"—that the Supreme Court in *Sun–Diamond* found to be "pregnant with the requirement that some particular official act be identified and proved." *Id.* at 406, 119 S. Ct. at 1407 (emphasis added). In stark contrast, none of these phrases are used in §§ 666(a)(1)(B) or 666(a)(2).

*United States v. McNair*, 605 F.3d 1152, 1190 (11th Cir. 2010). The question is whether *McNair* remains good law after *McDonnell*.

*McDonnell* involved an application of 18 U.S.C. § 201 to certain actions by the former governor of Virginia. *See* 136 S. Ct. at 2361. The Supreme Court held that an "official act" under § 201(a)(3)[12] requires a jury to "identify a 'question,

---

[12] "[T]he term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). In *McDonnell*, the parties agreed to "define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201." *See* 136 S. Ct. at 2365. Roberson argues that because the honest services statute does not use "official act," either, it is sensible to extend the official act requirement to section 666. This misunderstands the procedural posture in *McDonnell* and, without statutory support, improperly attempts to require an "official act" for federal bribery laws generally.

matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power." *Id.* at 2374 (quoting 18 U.S.C. § 201(a)(3)). The Court vacated and remanded McDonnell's conviction because the jury instructions did not comport with this definition of "official act." *See id.* at 2375.

The only Circuit Courts of Appeals to directly consider the issue in published cases post-*McDonnell*, the Second and Sixth, have not imported an "official act" requirement into section 666. *See United States v. Ng Lap Seng*, 934 F.3d 110, 134 (2d Cir. 2019) (holding that "*McDonnell*'s 'official act' standard does not pertain to bribery as proscribed by § 666"); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018) (holding that "[i]n *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than [§ 666]"); *cf. United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (stating with regard to a separate issue, *McDonnell* "had nothing to do with § 666"). In considering the purpose of section 666 to protect "the integrity of entities receiving substantial sums of federal funds" and the statute's "expansive, unqualified language," the court has repeatedly rejected statutory constructions aimed at narrowing section 666's scope. *United States v. Keen*, 676 F.3d 981, 990–91 (11th Cir. 2012) (internal quotation and citations omitted) (collecting cases in which the court has rejected attempts to narrow the scope of section 666). Consistent with the views of our sister Circuits, we hold that *McDonnell* does not disturb this

court's holding in *McNair* and we do not read into section 666 limitations unsupported by the language of the statute.[13]

Turning to the statute and facts at issue, there was sufficient evidence to convict Roberson and Gilbert under 18 U.S.C. § 666(a)(2). The statute provides that any person who (1) "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward[,]" (2) "an agent of an organization or of a State, local or Indian tribal government, or any agency thereof," (3) "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more[,]" when (4) the "organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance[,]" is guilty of bribery. 18 U.S.C. §§ 666(a)(2), (b). The parties stipulated that the fourth requirement was met, the others are evaluated in turn.

---

[13] The district court considered and dismissed concerns that part-time legislators, which exist in many states and may be required to supplement their income, may not have clear notice on what differentiates permissible paid advocacy work versus bribery. Although Alabama allows certain public officials to represent private interests in certain proceedings, provided they disclose their affiliation, *see* Ala. Code § 36-25-10, legislators are prohibited from representing entities, at least before executive departments and agencies *see id.* § 36-25-1.1. Further, Representative Robinson was contractually prohibited from disclosing and, in fact, never disclosed his affiliation with Drummond. Finally, 18 U.S.C. § 666(a)(1)(B) requires that an agent act "corruptly" to face liability. This scienter requirement serves as a backstop against convicting legislators who do not realize their conduct may cross sometimes obscure legal lines.

The first element requires that the jury find that Roberson and Gilbert each acted with a corrupt state of mind in paying the Foundation. Although Gilbert testified[14] that he did not enter into a contract with Representative Robinson corruptly, given the vast paper trail and the testimony of Representative Robinson, the jury had sufficient evidence to find that Roberson and Gilbert were corruptly engaging Representative Robinson. The jury was free to disbelieve Gilbert's testimony and to infer from Representative Robinson's testimony that the Appellants acted corruptly in soliciting Representative Robinson.

Representative Robinson testified that it was Roberson who first approached him and that Roberson was specifically interested in whether Robinson had any relationship with then Mayor of Birmingham, William Bell, and Congresswoman Sewell such that Representative Robinson could aid Drummond in enlisting their help regarding Drummond's efforts. Although Representative Robinson did not end up attempting to influence these individuals, the jury could reasonably infer that from the start Roberson was interested in using Representative Robinson and his position to influence other decisionmakers. Before speaking at the AEMC meeting, Representative Robinson met with Appellants to discuss how to approach the meeting and discuss the possibility of arranging a meeting between the Representative and Lanier Brown, the head of the AEMC, and to ask ADEM

---

[14] Roberson did not testify.

Director LeFleur to come to Birmingham. Representative Robinson testified that during this meeting, Appellants expressed that the purpose of having the Representative speak at the AEMC meeting was to engage ADEM because it was "the only vehicle at that time . . . that could slow the process of the EPA[.]"

Although one might argue that there was nothing improper or illegal about Robinson's contract with Balch to provide consulting and community outreach work for clients like Drummond, Representative Robinson testified that the community outreach work did not start until September 2015, long after the contact was signed and after Representative Robinson had already been issued several checks for many thousands of dollars from Drummond or AJE through Balch. As Gilbert confirmed, Robinson's proposal was the only one considered for the community work and there was no due diligence done to ensure his Foundation was even able to do the work. Further, it was just four days before the AEMC meeting that Representative Robinson signed the contract with Balch and was issued a rushed check for $14,000. The jury could reasonably infer from these facts that Appellants' intention was not primarily to enlist the Representative's community outreach services, but that he was engaged for his ability to use his position to influence other decisionmakers. Further, although it might be argued that ADEM had no official role to play by the time Representative Robinson spoke at the AEMC meeting, Appellants were exchanging emails discussing how they might be able to "influence ADEM's position," and to

16

make sure to "preserve any issues we want raised in the [NPL] appeal process," just a few days after the meeting. ADEM Director LeFleur testified that he was still engaging with EPA officials about the 35th Avenue site after the AEMC meeting, at least as late as October 2015.

Further, Gilbert testified that the payments to the Robinson Foundation were handled by Roberson personally and that the payment process was such that it "[i]n a general sense" hid the relationship between Drummond and the Robinson Foundation by routing the payments through the law firm. The government proffered evidence that Appellants concealed Representative Robinson's payments from both the AJE and Drummond by scrubbing invoices of information indicating his involvement, at Drummond's behest and with Gilbert's approval. Roberson, who headed the AJE and controlled its bank account, did not disclose to its members that their fees were being used to pay the Representative for his services.

The nature and timing of the payments, the secret recording of meetings, the routing of these payments through a charitable foundation, the nondisclosure of the payments to AJE members, and the failure of the parties to inform the EPA or other agencies of their financial relationship support the inference that the payments were made with a corrupt state of mind. *See McNair*, 605 F.3d at 1197. ("[T]he extent to

which the parties went to conceal their bribes is powerful evidence of their corrupt intent.").[15]

The second element of 18 U.S.C. § 666(a)(2) requires that the jury find that Representative Robinson was an agent of Alabama. Appellants argue that, at most, Representative Robinson was only an agent of the Alabama Legislature and not the State as a whole. This argument has been flatly rejected by both the First and Third Circuits and we reject it here. *See United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013) (finding that the Puerto Rico Senate is a constituent part of the Puerto Rican government and that its "members are thus part of the limited category of government officials who represent the 'State' as a whole"); *United States v. Willis*, 844 F.3d 155, 166–67 (3d Cir. 2016) (holding that the President of the Virgin Islands Legislature was an agent of the government). The statute defines agent to mean "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, . . . and

---

[15] Appellants are not aided by our opinion in *United States v. McCarrick*, 294 F.3d 1286 (11th Cir. 2002). There, the defendant used a business loan designated for a certain purchase to instead keep his business afloat and was subsequently charged with bank fraud. *Id.* at 1289. We found that the government failed to prove that the defendant had the specific intent to defraud at the time he signed the loan documents and that the "evidence overwhelming contradicts such a conclusion." *Id.* at 1293. We further noted that disbelief of the defendant's testimony could not be "the *sole* basis to support" the conviction. *Id.* Here, there was significant documentation and testimony by others involved, in addition to Gilbert's testimony. It was reasonable for the jury to infer that Appellants had the requisite intent in engaging Representative Robinson to use his position to undermine the EPA's efforts. *See United States v. Vigil-Montanel*, 753 F.2d 996, 999 (11th Cir. 1985) (holding that a "defendant's intent can be inferred from his conduct and all the surrounding circumstances").

*representative.*" 18 U.S.C. § 666(d)(1) (emphasis added). Representative Robinson, as a member of the House of Representatives, testified that his position entails voting on the budget for state agencies, including the ADEM, which is prototypical action on behalf of the state. *See Keen*, 676 F.3d at 990 (concluding "that to qualify as an agent of an entity, an individual need only be authorized to act on behalf of that entity"). Further, Representative Robinson might have been in a position to ultimately vote on approving any funds allocated from the state treasury to the EPA. *See* 42 U.S.C. § 9604(c)(3); *accord* ALA. CONST. art. IV (delineating the Legislature's role in appropriating state treasury funds). Finally, as the government notes, if a state legislator is not an agent of the state for purposes of section 666, it is unclear who would be. By the plain reading of its text, Representative Robinson is an agent of the State of Alabama for purposes of 18 U.S.C. § 666(a)(2).[16]

The third element requires that the jury find that Roberson and Gilbert intended Representative Robinson to act "in connection with any business, transaction, or series of transactions" of the Alabama government. 18 U.S.C. § 666(a)(2). In order to list a site on the NPL, the EPA has to consult with the State impacted. *See* 42 U.S.C. § 9604(c)(2). During all three specified acts, whether to

---

[16] To the extent Appellants argue that Representative Robinson can only be an agent for purposes of 18 U.S.C. § 666 insofar as his conduct affects funds directly within his control as a legislator, the statute is not so narrow and requires no such nexus.

expand the 35th Avenue site and the EPA's proposal to add the site to the NPL were pending matters, as indicated by an EPA letter stating that the EPA did not finish its considered expansion and NPL assessments until July 14, 2016.[17] It was reasonable for the jury to believe that Representative Robinson went to the EPA and AEMC meetings with the intention of influencing these decisions. This is supported not just by Representative Robinson's attendance, but also email correspondence from Gilbert, which states that "[w]e need to discuss how we can influence ADEM's position or have someone in the AG/Governor's office attend the meeting as well to make sure ADEM does [not] throw in the towel[.]" In addition, Representative Robinson also testified that Roberson first asked him to discuss Drummond's concerns about the EPA with Mayor Bell and Congresswoman Sewell, which further evinces that Roberson was hoping to use Representative Robinson's position as a legislator to influence relevant decisionmakers. Although Appellants attempt to paint the agreement between Balch and the Oliver Robinson Foundation as some sort of permissible advocacy campaign, as indicated Gilbert testified that the Foundation was the only entity asked to submit a proposal and that Gilbert and the Balch firm did not do any due diligence on the Foundation's ability to do the work. Considering this and other evidence presented showing that initially it was Oliver

---

[17] At least at the time of the trial, an EPA official testified that the 35th Avenue site remained on the list of proposed sites to add to the NPL.

Robinson's Communication company that was enlisted, it was reasonable for the jury to find that the Foundation was enlisted not for its outreach capacity, but because it gave Drummond and Roberson, through Balch and Gilbert, access to Representative Robinson in his position as a legislator.

Whether Representative Robinson impacted the ultimate decisions of AEMC or the EPA is immaterial. Rather, it is enough that Roberson and Gilbert intended Representative Robinson to act "in connection with any business" of the State of Alabama. 18 U.S.C. § 666(a)(2). Finally, although Appellants are correct that Representative Robinson voted on SJR-97 several months after entering into the contract, Gilbert's timesheets demonstrate that he worked on drafting this resolution that he hoped would "influence the whole state" the same day he met with Representative Robinson regarding "community outreach" and the same day that Representative Robinson submitted an invoice to Balch for "community involvement." It was not unreasonable for the jury to find that Representative Robinson was effectively on retainer and voted on the resolution given the continued payments by Balch. Accordingly, the evidence was sufficient for the jury to find that Gilbert and Roberson paid Representative Robinson intending to influence him "in connection with any business, transaction, or series of transactions" of the state government. *See* 18 U.S.C. § 666(a)(2).

Finally, Roberson's argument that a bribery conviction requires a specific act following *McCormick* and *Siegelman* fails. Those cases involved First Amendment concerns not at issue here, namely campaign donations. *See McCormick*, 500 U.S. at 273 (Hobbs Act imposes liability only when campaign contributions are "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."); *Siegelman*, 640 F.3d at 1169–70 (bribery case involving donations to Siegelman's private education lottery campaign). *McCormick* and *Siegelman* stand for the unremarkable proposition that when a case implicates First Amendment concerns, an agreement must be explicit such that "[n]o generalized expectation of some future favorable action will do." *Siegelman*, 640 F.3d at 1171.

Appellants, citing *Siegelman*, argue that the court should have instructed the jury about an explicit *quid pro quo* agreement because the Appellants were engaging in protected political speech, as their "campaign" was also political in nature. The facts of this case, however, are distinguishable from *Siegelman*. The bribe at issue in *Siegelman* was a donation to the "Alabama Education Lottery Foundation" which was formed "to raise money to campaign for voter approval of a ballot initiative to establish a state lottery." *Id.* at 1165. The entire purpose of the organization was for a specific and organized political campaign on a narrow issue. Here, while the contract was with a charitable organization with an educational focus, the money paid was not a "donation," and it was not for the sole purpose of the organization.

22

The alleged bribe here was a contract with an organization to purportedly perform community grassroots organization of a political nature different from what the organization typically did. Thus, these actions do not fall within the sort of political "campaign" that we were concerned with in *Siegelman*.

Further, although *Siegelman* involved section 666, it did not explicitly extend *McCormick*'s express *quid pro quo* requirement to all convictions made under section 666. *See id.* at 1172 (assuming but not deciding in determining whether an error was reversible, that a *quid pro quo* instruction was required to convict under section 666). Moreover, although *McDonnell* specified that the "question or matter" to be influenced must be identified, that case did not reject the retainer theory of bribery. *See* 136 S. Ct. at 2369–70; *see also United States v. Silver*, 948 F.3d 538, 552–55 (2d Cir. 2020) (noting that *McDonnell* did not invalidate the "as the opportunities arise" theory of bribery). Thus, the retainer theory of liability is still a valid basis of conviction under section 666 in this type of case.

In instructing the jury on honest services wire fraud, the district court defined the charge with reference to 18 U.S.C. § 201. No party challenges the instruction based on its reference to section 201.[18] That statute criminalizes the bribery of public

---

[18] Because the parties do not dispute this point, the court does not decide whether an "official act" as defined in 18 U.S.C. § 201 is required to sustain an honest services wire fraud conviction premised on section 666.

officials with "intent . . . to influence any official act[.]" 18 U.S.C. § 201(b)(1)(A). There was sufficient evidence for the jury to find that an official act had occurred.

Whether or not Representative Robinson's actions in regard to the EPA and AEMC meetings are "official acts" under the standard set forth in *McDonnell*,[19] his vote on SJR-97 is undeniably an official act as it involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 136 S. Ct. at 2372. Appellants do not meaningfully argue that the SJR-97 vote was not an official act. Instead they argue that (1) there is no evidence that Appellants bribed Representative Robinson to vote on the resolution, (2) Representative Robinson did not vote on the SJR-97, or (3) a single "official act, coupled with non-official acts and inadequate instructions, requires a new trial."[20]

Taking each of these three arguments in turn, first, as noted above, the government put on sufficient evidence under the "retainer" theory of liability for the

---

[19] Given the jury instructions and facts that were established, the jury could properly find these to be "official acts." *McDonnell* notes that an official act "may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell*, 136 S. Ct. at 2372. Although attending a meeting without more is not enough, there is sufficient evidence for the jury to find that Robinson attended the AEMC and EPA meetings intending and attempting to use his position as legislator to influence their decisions related to the 35th Avenue site, particularly as the Alabama legislature would have to ultimately approve the ten percent funding contribution required to list a site on the NPL.

[20] As indicated *infra* Part II, the jury instructions were adequate.

jury to find that the Appellants had bribed Representative Robinson to vote on the resolution. *McDonnell* confirmed that an "agreement need not be explicit," and that it is enough that "the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." 136 S. Ct. at 2371. The second argument is easily disposed of as Representative Robinson admitted that he voted on the resolution in a voice vote. Although Representative Robinson had previously told investigators that he had not voted on the resolution, it was reasonable for the jury to find that his later statement was the truth. Finally, the third argument fails because "[a] conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (citation omitted).

## II.    Jury Instructions

Roberson and Gilbert argue that the district court erroneously instructed the jury.[21] First, Roberson argues that the district court should have instructed the jury that a federal bribery conviction required an "official act" and, accordingly, that Representative Robinson "expressing support" for a policy was insufficient under 18 U.S.C. § 666(a)(2). Gilbert further contends that the district court was required

---

[21] The jury was instructed on conspiracy and a variety of underlying substantive crimes. Only the bribery and honest services instructions are challenged.

to supply the jury with a technical definition of when "advice" rises to the level of official action. Second, Roberson argues that the court was required to instruct the jury that a conviction required an "explicit" corrupt agreement, in order to avoid potential First Amendment complications. Finally, Gilbert argues that the district court constructively amended the indictment by instructing the jury on the "retainer" theory, requiring a new trial.

As noted above, the district court was not required to give an instruction on an "official act" at least as to the section 666 bribery count. As we have already concluded that the First Amendment cases are not implicated here, we do not further address Roberson's argument that the jury instructions should have required an "explicit" or more specific agreement to avoid such First Amendment concerns. To the extent "official acts" are referenced with respect to the honest services counts, no further instructions regarding the difference between "advice" or "expressing support" are necessary.

In assessing whether the district court erred in refusing a jury instruction requested by a defendant the court considers whether the requested instruction "(1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendant's ability to defend." *United States v. Opdahl*, 930 F.2d 1530, 1533 (11th Cir. 1991) (quoting *United States v.*

26

*Lively*, 803 F.2d 1124, 1125–26 (11th Cir. 1986)). The Appellants' requested jury

instruction regarding what an official act excludes read as follows:

> Not everything that a public official does in his official capacity is an "official
> act." Under the law, certain actions by public officials are not considered official acts, even if those acts are performed in an official capacity.
>
> For example, the following are not, without more, official acts: meeting with
> other officials, speaking with interested parties, or expressing support for (or opposition to) a policy or course of action; setting up a meeting or talking to another official; giving a speech; lobbying government agencies or advocating for constituents; taking a public position on an issue; or sending a letter on official stationery.
>
> This may come as a surprise to you, and you may even feel uncomfortable with the idea that someone can give a public official something of value in exchange for
> these types of assistance–but, under the law, doing so is not a federal crime.

The relevant portion of the jury instruction given was:

> The public official's action or decision or agreement to make a decision or take an action on that question, matter, cause, suit, proceeding, or controversy may include using his official position to exert pressure on another official to perform an official act or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.
>
> But setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more is not an official act. When considering whether a public official exerted pressure or gave advice, you must consider what the public official actually did, not simply what his title or position was.

Appellants contend that the court should have specified that "expressing support" without more is insufficient to sustain a bribery conviction and that the court was required to instruct the jury on this distinction between advising and merely expressing support. *McDonnell* states that "setting up a meeting, hosting an event or calling an official (or agreeing to do so) merely to talk . . . or to gather additional information," or "expressing support" is not necessarily enough to show that a public official committed an official act or was providing advice or exerting pressure on another official to take an official act. 136 S. Ct. at 2371. The Court goes on to say, however, that if an official takes such action

> on a question or matter that is or could be pending before another official, that [action] could serve as evidence of an agreement to take an official act. A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id.* Notably, in later describing the standard the Court states that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'" *Id.* at 2372. Although the Appellants' proposed jury instruction is not incorrect that expressing support alone is not necessarily enough to sustain a bribery conviction "without more," the proposed instruction is vague as to what "without more" means in this context. What *McDonnell* makes clear is if an official attempts to "pressure or advise another

28

official on a pending matter" the crucial "more" exists. *Id.* at 2371. Read as a whole, the proposed jury instruction is incomplete or misleading if not legally incorrect.

But even if it might have behooved the district court to alter the standard language offered in *McDonnell* to include "expressing support" in its list of acts that do not necessarily rise to an official act, the remainder of the instruction sufficiently covered the issue. First, the instruction pulled language directly from *McDonnell* detailing what types of conduct are insufficient to constitute an official act such as "setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more[.]" This list makes clear that not all conduct by an official that could in some way influence another official could properly sustain a bribery conviction. Further, the court urged the jury to "consider what the public official actually did, not simply what his title or position was." This qualification further highlights that not everything an official does or says can sustain the charge. Finally, the court noted that the official either needed to take official action himself or use his official position to "exert pressure on another official" or "advise another official,[22] knowing or intending that such advice will form the basis for an official

---

[22] Appellants rely on *United States v. Birdsall*, 233 U.S. 223 (1914), which formed the basis for *McDonnell's* "advise or pressure" type of official act, *see McDonnell*, 136 S. Ct. at 2371–72, to argue that the advice must come from someone in a more formal advisory role. *Birdsall* was a bribery case where the government officials being bribed were subordinate employees to a commissioner and accepted bribes to change their reports and recommendations to that commissioner, who would in turn advise the President on an official action. *See* 233 U.S at 234–36. Thus, the subject of the bribe, the official act in that case, was a formal recommendation of action. *See id.* We, like the Sixth Circuit, cannot find any phrase in *McDonnell* which supports

act by another official." Although the line between expressing support and advising may be opaque, by adding the qualifying language "knowing or intending that such advice will form the basis for an official act by another official[,]" the instruction made clear that any advice rendered must have been intended to alter the other official's conduct, not merely to express support. Thus, although the phrase "expressing support" was not included in the final instruction, the final jury instruction substantially covered the issue.

Finally, the instruction was not "so 'vital' that the failure to give the requested instruction seriously impaired the defendant's ability to defend." *Opdahl*, 930 F.2d at 1533 (quoting *Lively*, 803 F.2d at 1125–26)). Even if the jury could have reasonably understood Robinson's attendance at the EPA or AEMC meeting to be simply an expression of support for a position, it strains credulity that Robinson's SJR-97 vote could be understood as merely an expression of support for a course of action rather than an explicit attempt to use his legislative authority to alter the course of the EPA's or ADEM's official conduct. A finding that a legislative resolution urging the EPA to reconsider its conduct and ADEM to "combat the EPA's overreach" by taking "any and all steps within their power" to address the EPA's actions is simply expressing support obliterates the line between pressuring

---

the very narrow view of "advise" or "pressure" advocated by Appellants. *See United States v. Lee*, 919 F.3d 340, 352–53 (6th Cir. 2019).

or advising and expressing support. No reasonable jury could have found that the vote on SJR-97 was merely expressing support and thus the requested language was not vital, and the district court did not abuse its discretion.

The remaining jury instruction issue is whether the instructions constructively amended the indictment. Jury instructions constructively amend an indictment "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013) (internal quotation and citation omitted). The government points to several paragraphs in the indictment that support a retainer theory of liability, which each count incorporates by reference.[23] Thus, the language in the indictment provided sufficient notice to Appellants that the government was pursuing a retainer theory of liability.

---

[23] The government references multiple paragraphs in the Indictment, specifically ¶ 14 ("As part of the overall strategy, Balch & Bingham paid Representative Oliver L. Robinson, Jr., through a valuable consulting contract with the Oliver Robinson Foundation to, among other things, take official action favorable to Balch & Bingham's and Drummond Company's interests in matters related to EPA's actions in north Birmingham"), ¶ 18 (Appellants "would and did agree that the Oliver Robinson Foundation would be given a valuable consulting contract and monthly payments in exchange for, among other things, favorable official action by Representative Robinson in relation to the environmental issues in north Birmingham."), ¶ 19 (Appellants offered a "lucrative contract and monthly payments between Balch & Bingham and the Oliver Robinson Foundation to corruptly influence and reward Representative Oliver L. Robinson, Jr., in connection with the use of his position as a member of the Alabama House of Representatives"), and ¶ 21 (Representative Robinson agreed to "use his official position to pressure and advise other public officials, consistent with the position of Balch & Bingham and Drummond Company, to oppose EPA's actions in north Birmingham.")).

The jury instructions state that Appellants could be found guilty if they "gave a thing of value to the Oliver Robinson Foundation with the intent to retain the services of Oliver Robinson on an as-needed basis so that Oliver Robinson would take actions as specific opportunities arose in his role as an agent of the State of Alabama[.]" This instruction does not broaden the possible basis of conviction beyond what was alleged in the indictment, but simply clarifies the law. *Cf. United States v. Elbeblawy*, 899 F.3d 925, 938 (11th Cir. 2018) (noting that "the slightly different wording of the jury instruction" in a fraud prosecution "did not amount to a constructive amendment of the indictment"). The facts relating to the applicable legal standard were repeated multiple times in the course of setting forth the law in the indictment and the judge's slightly different wording of the facts does not amount to constructive amendment.

## III.    Refusal to Sever Trial or Grant a Mistrial

Roberson also argues that the district court should have severed the trial pursuant to Federal Rule of Criminal Procedure 14(a), and failure to do so led to events requiring a new trial. Roberson states that because of joinder he was unable to properly present a reliance on the advice-of-counsel defense.[24] Roberson argues

---

[24] The National Association of Criminal Defense Lawyers ("NACDL"), appearing as amicus curiae, filed a brief supporting severance. *See* Br. of the Nat'l. Ass'n. of Criminal Defense Lawyers as *Amicus Curiae* in Supp. of Def.-Appellant David Lynn Roberson, Supporting Reversal (Mar. 21, 2019).

that certain evidence was excluded at trial because it inculpated Gilbert, even though that evidence supported Roberson's defense that he relied on counsel, Gilbert, in believing his actions were legal. Specifically, the trial court excluded a portion of an FBI agent's written summary of Roberson's interview with the FBI in which Roberson states that he had checked with Gilbert to ensure "there was no problem with what they were doing." The full passage at issue, with the portions excluded at trial underlined, states:

> After the Hubbard trial,[25] Roberson considered what they were doing, i.e., contracting with a state representative, in light of the ethics law but determined that the area targeted by the campaign was not in Robinson's district. Roberson stated that they (Drummond) have always been very careful, and he (Roberson) has a reputation to maintain. Roberson had a conversation with Gilbert about ethics considerations. Roberson wanted to know if it was a problem for him (Roberson) to be associated with the effort because he was a lobbyist. Gilbert later told Roberson that he checked with Greg Butrus and Chad Pilcher at Balch, and there was no problem with what they were doing.

Roberson argues that pursuant to the rule of completeness, but for the fact that Gilbert was his co-defendant,[26] the omitted passage would have been read into evidence. *See* FED. R. EVID. 106. Roberson claims this exculpatory evidence was

---

[25] In 2016, Mike Hubbard, the former Speaker of the Alabama House of Representatives, was tried and convicted of ethics violations unrelated to this case. *See* Brian Lyman, *Mike Hubbard Sentencing Hearing Set to Begin*, MONTGOMERY ADVERTISER, July 8, 2016.

[26] The Confrontation Clause prohibits the admission of a non-testifying defendant's confession if that confession directly inculpates another defendant. *See Bruton v. United States*, 391 U.S. 123, 126 (1968). The district court redacted the portions of the FBI's Roberson interview at issue pursuant to *Bruton*.

critically important to his advice-of-counsel defense. Roberson also argues that the exclusion of portions of the FBI interview distorted the meaning conveyed by the admitted portions and rejects that any other evidence presented at trial was curative of this omission as the government undermined that evidence in its closing, when "[i]n its final arguments to the jury, the Government dismissed [the relevance of] that 2014 meeting because '[i]t was Mike Tracy, the CEO of Drummond,' who asked Gilbert for advice: '[i]t wasn't David Roberson.'"

Although Roberson raised the motion to sever early in the district court's proceedings, we focus first on the district court's later denial of a motion for a new trial because if the district court was correct in denying the motion for a new trial then "its earlier rulings not to sever–when it had even less evidence of potential prejudice before it–were necessarily correct." *Blankenship*, 382 F.3d at 1121–22. In evaluating whether a motion for a new trial should have been granted, first the court must assess whether there is a risk of prejudice. *See Zafiro v. United States*, 506 U.S. 534, 538–40 (1993). Next the court must ascertain whether severance was the necessary remedy, as "[t]here are only two circumstances in which severance is the only permissible remedy[;]" (1) when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants," or (2) to "prevent the jury from making a reliable judgment about guilt or innocence." *Blankenship*, 382 F.3d at 1122–23 (quoting *Zafiro*, 506 U.S. at 539). Here, Roberson's central

argument is that he was denied his constitutional right to present a complete defense.[27] *See* U.S. CONST. amend. VI.

Amicus NACDL urges the court to exercise caution when considering trying attorneys and their clients jointly, averring that severance is often the only way to avoid a severe risk of prejudice. For support, it cites *United States v. Walters*, 913 F.2d 388, 393 (7th Cir. 1990). *Walters* involved the joint trial of two business partners involved in a college football recruitment and representation scheme. *See* 913 F.2d at 389–90. One of the partners, Walters, wished to pursue an advice-of-counsel defense whereas the other, Bloom, did not. *See id.* at 392–93. The district court refused to sever the trial and subsequently Walters called their joint attorney to testify, forcing Bloom to waive his attorney-client privilege and "skittle along behind [the defense] of Walters." *Id.* at 393. Whatever force *Walters* has, it does not counsel so broad a rule favoring severance that it would apply here. In this case, Roberson was not only prepared to waive his attorney-client privilege, but his motion for severance was in part predicated on ensuring that Gilbert testified as to the legal advice he gave Roberson. Given the possibility that Gilbert might invoke his Fifth Amendment right against self-incrimination, Roberson argued that severing the trial was required to secure Gilbert's testimony.

---

[27] As the jury instructions noted, "[e]vidence that a defendant in good faith followed the advice of counsel would be inconsistent with the unlawful intent required for each charge in this case."

Instead Gilbert and others testified consistently with Roberson's advice-of-counsel defense.[28] The only evidence Roberson claims he was prevented from introducing at trial were the redacted portions of the FBI report. Although this evidence lends additional support to Roberson's advice-of-counsel defense, its exclusion is not misleading with respect to the portion that was admitted, given the other evidence presented, and essentially was cumulative. Additionally, Roberson's statements to the FBI are of little probative value in comparison to the other evidence on point considering their self-serving nature, that they were made after the conduct at issue took place, and given that they do not clearly demonstrate that Roberson asked about the legality of his actions before the conduct had occurred. *See Browne*, 505 F.3d at 1270 ("If the testimony is purely cumulative, or of negligible weight or probative value, the court is not required to sever.") (citation omitted); *see also United States v. Novaton*, 271 F.3d 968, 990 (11th Cir. 2001) (holding that "statements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance"). In sum, the exclusion was not so prejudicial as to compromise Roberson's ability to present his defense or deny him a fair trial. *See Novaton*, 271

---

[28] In particular, James Tracy, the CEO of Drummond Company, stated that Gilbert told him that the arrangement with Representative Robinson was legal, during a meeting in which Roberson was present. That the government downplayed the relationship to Roberson during its closing is of no moment. The jury was free to evaluate the testimony. Additionally, Gilbert stated during cross-examination that he assured both Tracy and Roberson that everything was legal and ethical.

F.3d at 989 (citation omitted) (requiring an appellant to show "compelling prejudice" for a court to find an abuse of discretion in the district court's refusal to sever); *cf. United States v. Cobb*, 185 F.3d 1193, 1197–98 (11th Cir. 1999) (holding that it was an abuse of discretion to deny severance in a case where a joint trial prevented the admittance of exculpatory testimony evidence that contradicted the sole evidence against the defendant seeking severance). Thus, the district court's decisions not to sever the cases for trial or subsequently grant a mistrial were not abuses of discretion.

## CONCLUSION

For the reasons stated above, we affirm the convictions of Gilbert and Roberson. **AFFIRMED.**